Julian **SHERRIER**, Plaintiff,

v.

Bernice **RICHARD**, Defendant.

No. 82 Civ. 3723 (RWS).

United States District Court,
S.D. New York.

March 16, 1983.

Greenfield, Eisenberg, Stein & Senior, New York City, for plaintiff; Norman A. Senior, Gary B. Friedman, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendant; Gerald A. Rosenberg, Douglas N. Gordon, Lauren Reiter Brody, Susan Arinaga, New York City, of counsel.

## OPINION

SWEET, District Judge.

This is a drama concerning the star-crossed relationship of a man and a woman which masquerades as a diversity action brought by the plaintiff, Julian Sherrier ("Julian"[1]), a London resident and a citizen of Pakistan and Great Britain, against the defendant Bernice Richard ("Bernice"), a New York resident. Julian seeks a declaration of rights and a mandatory injunction concerning the ownership interests in five pieces of Gandharan art,[2] the value of which ranges from $600,000 to over $2 million, depending upon the purpose for which the valuation is made. On the following findings of fact and conclusions of law, judgment will be entered in accordance with this opinion declaring Julian to be the owner of the Fasting, Princely and Elongated Buddhas, and Bernice to be the owner of the Standing and Seated Buddhas. In addition, judgment will be entered in Bernice's favor for $236,500 with interest from the date of entry of the judgment.

Both parties testified to the facts at length and frequently to widely differing effect in a ten-day bench trial. The testimony recounted intercontinental romance and dealings in art. To state the facts simply is to sketch the peaks and valleys of the efforts of two complicated individuals with differing motivations to create a relationship of trust, an effort which ultimately failed with such significant results that the consequences can only be unravelled in this court of last resort, appeal, of course, aside. This is not the customary diversity case, these are not the familiar dramatis personae of litigation in this court, and exotic art objects are relatively infrequently the subject of declaratory judgments. The application of legal theories ranging from partnership to joint venture must acknowledge the realities of the conflicting emotions which have powered the creation, continuation and presentation of this complicated dispute. Fortunately, I have been greatly assisted by highly-skilled counsel for both parties who have presented this difficult

1. For reasons apparent in the facts as found the parties during the trial on occasion found it more comfortable to use first names and that practice will be continued.

2. Gandharan art is an art form which developed in a region of India, now North-West Pakistan in the 2nd Century B.C. through the 6th Century A.D. It consists of stone sculpture, mainly representing images of Buddha and scenes from Buddhist texts, with marked Greco-Roman influences.

trial with cool and competent professionalism.

Julian filed his complaint on June 7, 1982 alleging that he owned five pieces of Gandharan art which were wrongfully being withheld by Bernice. At the same time by order to show cause he sought relief by way of preliminary injunction. Bernice answered and counterclaimed for moneys due and owing, and for a declaration of ownership in the same five pieces. Both sides engaged in expedited discovery, agreed that the hearing on the preliminary injunction and the trial on the merits would take place at the same time, and with great effort and application by counsel thirteen witnesses were presented in ten trial days.

The testimony of Julian and Bernice on many critical issues is directly contradictory. Neither has been completely credible, and the following facts are found after a painful search, relying on corroboration where it exists, the circumstances at the time of the events described, and the evaluation of the truth-telling capacity of Bernice and Julian on each of the issues, having in mind their respective motivations and concerns. It is difficult to imagine a more tortuous path to truth, or one more dependent on the evaluation of the credibility of the witnesses.

### Findings of Fact

In the fall of 1978 Julian was in New York making the rounds of various art dealers and attending to his interests as a dealer and authority in Gandharan art. He was born in India, educated there and in England, and was the husband of Elizabeth and the father of a daughter, Romany. By occupation he was a sometimes actor, but he was principally occupied in the world of Gandharan and Asian art as a dealer in art objects of the period and as a lecturer on the subject. In that connection in July, 1977, he had obtained a loan from First London Securities Ltd. ("Rossminster") in order to purchase a piece of Gandharan art, referred to as the Nataraj[3], an Indian bronze sculpture also known as the Dancing Shiva. The terms of the loan included a provision for the payment of interest at the rate of 60% per annum. Julian was hard-pressed financially, and under pressure from what he referred to as his "merchant bankers." He had sought and obtained renegotiated terms which required certain payments by May, 1979.

In the fall of 1978 Bernice was a wealthy New Yorker, and the widow of George N. Richard. She lived in her townhouse on 5 East 64th Street. She too had more than a nodding acquaintance with drama and had appeared on the musical comedy stage and in supper clubs. Although she had not obtained any degrees, she had studied philosophy and had become a student of languages, traveled considerably, and was a patron of the arts. She possessed substantial art, including important Impressionist paintings. She too had a daughter and a number of friends in the art world, including Dara Zargar ("Dara"), whom she invited to join her at a benefit and dinner on a Thursday evening in late November. Dara was also a friend of Julian's, and it was arranged that Julian would join the party, as did Nadine Castro ("Nadine") who was, or became, engaged to Dara.

Julian and Bernice immediately hit it off, and their second evening together the following Saturday terminated at six in the morning accompanied by mutual curiosity and Bernice's coffee. They met again on Sunday, the exploration continued and included sexual intercourse, referred to in the vocabulary of the trial as "intimacy." From that time until Julian's departure for London the following Wednesday, the couple were together much of the day and night. At a very early stage of the relationship Julian described his difficulties, both financial and marital, referring in particular to the loan from the merchant bankers and the coolness of his wife Elizabeth.

Soon after leaving New York, Julian wrote the first of a series of letters which

---

**3.** No effort will be made to describe the pieces of art which are involved other than by the terms commonly used by the parties and by a brief non-technical description.

provide something of a chronicle of the relationship with Bernice. At some time during the relationship at the suggestion of his long-time friend, Peter Paone ("Peter"), Julian destroyed the letters received from Bernice as well as whatever business records he possessed, an act which was defended as prudent at the time but which in this context has reduced Julian's assertions to simple uncorroborated testimony in certain critical areas. However, there is little dispute that in the fall of 1978, a romantic affair was burgeoning, the future was uncertain, and the deepest motivations of Julian and Bernice presumably were unknown to each.

Julian sought help in dealing with his merchant bankers, and Bernice offered to send a letter to his bankers indicating that she might be an interested buyer for his art. Bernice consulted her counsel, who objected to the sending of such a letter. She sought the assistance of Dara who referred her to his lawyer, Robert Ross ("Ross"). Ross conferred with Bernice and assisted her in preparing a letter. Bernice gave it to Dara to be typed on the letterhead of the George N. Richard Foundation, a charitable foundation which had been dissolved the year before, a fact which Bernice asserted she had forgotten despite her prior execution of the Articles of Dissolution. It was signed by her in her capacity as President and sent off, indicating perhaps at least subliminally that she heard her lawyer's initial objection to any meaningful action.

Telephone calls and correspondence were exchanged between Bernice and Julian. It was noted that Bernice's Foundation letter had failed to assuage the merchant bankers. Out of these exchanges emerged a practice which became symbolic of the difficulties ahead. Julian reversed the charges on his calls, and Bernice thus adopted the role of financier to the relationship.

Early in 1979 Julian arranged to have certain small pieces sent to Bernice's home as an appropriate place for display and sent as well his New York folio, a collection of photos of pieces that he had available for sale. The possibility of a purchase by Bernice of one of Julian's pieces, the Muchalinga, was discussed and then rejected. A loan by Bernice was considered as an alternative.

In April 1979, Julian returned to New York to pursue his business, to consult with museum directors, give lectures, and refresh the relationship with Bernice, all of which was accomplished. Julian and Bernice spent a great deal of time together, traveled to Worcester (for a meeting) and to the Ritz Carlton in Boston (for pleasure), and Julian described his problems and the potentialities of his business. The unsettled political conditions in Pakistan at the time and increased Islamic militancy combined in his view to present an opportunity to acquire Gandharan art from those whose willingness to sell might be increased by their fear of not being able to retain their collections. Bernice expressed interest in helping him, and at a luncheon with the Paones she stated that she and Julian were going to do business together employing his knowledge and her resources.

At the end of the two week visit she agreed to loan him approximately $127,000 to relieve the pressure of the London loan. On Friday afternoon, April 14, 1979, Bernice in company with Julian went to her bank to arrange for the transfer of $112,000 to Julian's account in London. Saturday morning in her kitchen he gave her a handwritten receipt for the loan, a document no longer in existence. He left for London that evening after an unsuccessful effort at intimacy which ended in a shopping trip and subsequent concern by Bernice. The letter, written by Julian from the plane, apparently affectionate and concerned, is now regarded by Bernice as a "fraud," deceitful in its overall purpose and intent, but it served its purpose at the time, since the relationship continued to expand and deepen. Shortly after Julian returned to London, Bernice wired an additional $7,000 to Julian's account and an additional $8,000 was later given by her.

Bernice, however, was equipped with advisors, and as she expressed some misgiv-

ings, they counseled her to protect her interests, in particular, the loan. She told Ross to take care of it. He called Julian, asked for security for the initial loan, and the execution of a more formal promissory note. Julian readily agreed and may even have suggested the security, the Fasting Buddha. In any case, it was agreed that the Fasting Buddha, Julian's most important piece in New York,[4] would be delivered to Bernice as collateral, a delivery which was accomplished in July, 1979. The note was never returned, but Julian has consistently acknowledged the loan.

The Fasting Buddha was therefore turned over to Bernice as collateral for the loan. This is the most important of the five pieces involved, worth from $300,000 to over $1 million depending upon the basis for which the evaluation is made. While there is no dispute as to the interests in the Fasting Buddha at the time of its delivery to Bernice's home in July 1979, she maintains that she acquired an ownership interest in July 1980, as a consequence of events shortly to be described.

Both Julian and Bernice sought to trust the other, each at the same time harboring suspicions—Julian, that the romance would not work out, especially since he had determined not to leave his wife and child, and Bernice, that the romance might not develop as she hoped and that her investment both emotionally and financially might be unwise. In the spring of 1979, these suspicions were suppressed, and they agreed to meet in Rome on the eve of a trip by Julian to Pakistan to explore the possibility of acquiring a collection which he had just learned might be on the market. He stressed the immediacy of the opportunity, and pleaded with Bernice for funds to hold the collection until it could be viewed. She agreed to send $50,000 to his account in London with the understanding that it would be held in escrow for that purpose with Julian's solicitor. In fact, around the time Julian received the funds, he turned

over $50,000 to the young son of the family in possession of the collection as a deposit to hold the collection. At that time, he also made payments on the Rossminster loan. Aside from certain bank records, none of these transactions were evidenced by a receipt or writing of any kind.

In late May 1979, Bernice forwarded $25,000 for expenses to Julian in Rome where she met him, a romantic interlude ensued, and Julian departed for Pakistan, only to be arrested at the airport and jailed, apparently in part as a consequence of the cash he was carrying. He got word to Bernice, who retained counsel and supplied him with other necessities, including a towel to assist in the sunbathing, his principal occupation while incarcerated. Through the efforts of local counsel, Julian was released, although the $10,000 in travelers checks and the $15,000 in cash he was carrying remained impounded until the charges were dismissed, as later occurred. In the meantime, in June, Bernice replaced the $25,000, after having given Julian $4,000 in Rome for immediate expenses.

After a short time Julian was again on his way to Pakistan although a dispute with Bernice had arisen, Julian having stated his unwillingness to leave his wife and child. According to Bernice's present recollection, this terminated their relationship, their effort to create a future together, and she maintains that thereafter she never wrote to Julian. However, in fact, she continued to trust Julian, to advance funds without any clear understanding or limitation as to their use, reassured perhaps by his affirmative response to her inquiry about the $50,000 and the requested escrow. Bernice had not been a collector of Gandharan art, and her eye was much more closely upon Julian than his objects, a fact which certainly rebounded to his financial advantage.

Upon arrival in Pakistan, Julian discovered that the collection was not available and was reimbursed the $50,000 in Pakistani Rupees. He went to Peshawar, Pakistan in

4. Julian had no place of business in New York but used the apartment of his brother in which he had a room both as a lodging and as storage for his objects. It was there that the Fasting Buddha was kept.

the Northwest Frontier in search of pieces in the company of a middle man, Bedar Shah ("Shah"). Shah introduced him to Mohammad Siddik ("Siddik") who showed Julian two Buddhas, the Standing Buddha and the Seated Buddha. Bargaining ensued, a price of $160,000 was arrived at, and Bernice, having been advised of the progress of the negotiations, agreed to the purchase and forwarded an additional $110,-000. Arrangements were made for shipment, and Julian departed. No receipts or documents were exchanged. It was explained by Julian and William Wolff ("Wolff"), another dealer in Gandharan art, that frontier rules apply: cash without receipts, rifles in the street, and reliance only upon trust. It is apparent that the traffic in these objects is not sanctioned or registered by the authorities. Julian's testimony is credited that he expended an additional $21,000 to acquire the Standing and Seated Buddhas and to arrange for their transportation.

Julian returned to London, then went to Berlin for a lecture where he was joined by Bernice, who had responded to his overtures and been willing to resume their love relationship despite arguments revolving in part around a telephone call to Elizabeth by Nadine and Dara from Bernice's home in which the relationship between Julian and Bernice was discussed. At this time, the parties understood and agreed that the pieces had been acquired by the use of Bernice's funds and that they would be sent to her in New York where they could be displayed in her home. Upon his departure from Berlin, Julian gave Bernice a handwritten accounting of the expenses incurred in the acquisition of the Standing and Seated Buddhas. Bernice went to Italy and then to London where she stayed for a short time in Julian's mother's apartment.

Over the summer of 1979 Ross sought to obtain bank records from Julian concerning the Rossminster loan, the use of the $50,000 and an accounting of the purchase of the two Buddhas. Julian came to New York in September, gave Ross a typewritten accounting which replicated that which he had given Bernice in Berlin, and then with

Bernice collected the Standing Buddha when it arrived together with a second crate which contained ashtrays instead of the Seated Buddha. Bernice was concerned, and Julian indicated that some problems had developed over the shipment of the second piece.

Bernice suggested that she obtain a small apartment in London so that their relationship could continue, understanding that Julian's marriage was "open." Julian rejected the suggestion. His letters to Peter indicate the difficulties he had experienced with his mother and his wife in London. Whatever his reasoning may have been, his unwillingness to establish the relationship with Bernice on a more regular basis was very troubling to Bernice, as was the nonarrival of the Seated Buddha. Julian explained that the piece was being held up, that it would have to be ransomed and requested an additional $16,000 for that purpose which Bernice forwarded. Thereafter, Bernice transferred 500 pounds to Shah for related purposes. The Seated Buddha eventually arrived in May, 1980. Both the Seated and Standing Buddhas were photographed, presumably for the purpose of future sale.

Just before leaving for London in the fall of 1979, Julian expressed his distress at his financial conditions and his inability to sell his objects, in particular the Padmapani Bronze which he had offered at $75,000 and then dropped to $25,000, still without takers. Bernice bought the piece at that price in October, 1979, and it was delivered to her home.

Julian and Bernice disagree on the manner in which payment was made by Bernice for the Bronze. She claims that she paid him $25,000 in cash at her bank in New York on October 10, 1979. He claims that on that day he was not in New York City—having given a lecture in Amherst, Massachusetts, and not having returned to New York until the evening of October 10, 1979, after the bank had closed. Julian claims that in payment for the Bronze, Bernice arranged to have $16,000 wired to Shah's

account in London (which Julian used for the ransom payment referred to above) and that Julian was to receive the proceeds of the $10,000 in travelers checks previously confiscated in Rome, leaving a $1,000 credit to Bernice for overpayment. There is no documentary evidence regarding the use of the travelers checks or of the withdrawal of cash from the bank. There is evidence that $16,000 was wired to Shah's account. Julian's version of the payment is credited in the absence of any record to the contrary, bank or otherwise.

At year-end 1979 Bernice made a contribution to the Metropolitan Museum of Art ("the Met") of $35,000 for an acquisition. Word got to Julian of the contribution, and of the possibility of the Met purchasing one of his pieces. Its curator, Martin Lerner ("Lerner"), who testified, was known both to Julian and Bernice.

At the same time during the fall of 1979 and early 1980 Julian sought to put together a group of important pieces to sell to a customer of Ben Heller ("Heller"), a well-known and successful entrepreneur in Asian art and real estate. This transaction was contingent upon the tax treatment to be achieved by the purchasers and required a purchase price that was acceptable, the ability to obtain an appraisal in a greater amount, an appropriate holding period, and the ultimate gift of the pieces to a museum with an appropriate tax deduction. Transactions of this nature were discussed with Lerner, Heller and others, and involved the so-called "three-to-one" ratio of the initial purchase price to donation value.

However, at one time during the spring of 1980 Julian suggested to Bernice that she consider the acquisition of the Fasting Buddha and a subsequent gift for tax purposes. Her accountant advised her that the deduction was greater than could be utilized, and no action was taken to implement the suggestion. The negotiations with Heller came to include the Padmapani Bronze which Bernice had purchased. Bernice was sufficiently interested to deliver it to Heller for his review with a view toward inclusion in the overall transaction.

At this point, the enterprise between Bernice and Julian was still on—an enterprise which was understood to have future dealings with respect to Gandharan art and perhaps to provide some sort of a life together. Although Bernice had terminated the romantic relationship by her request for a final arrangement made in a telephone call, and acknowledged by Julian in his telegram to her, her distress at the irregularity of the romance had been overcome in the past, and Julian's letters reflected his hope that it might again be overcome in some fashion in the future.

Precisely that did occur in London in July, 1980. Bernice met Julian there and they talked at the Grosvenor Coffee Shop where some degree of trust was reestablished. The next day they met again at Bernice's suite. According to Bernice, their intimacy was not resumed. According to Julian, it was. Fortunately that detail need not be resolved, for there is no doubt but that some element of trust was reestablished. According to Bernice, she raised the question of the $127,000 loan which was to have been repaid on January 1, 1980, Julian indicated his inability to repay, and Bernice then suggested that the loan secured by the Fasting Buddha be converted into a partnership interest in the Fasting Buddha, to which Julian replied as he had on many other occasions, "anything you say, dear." Julian denied the conversation and the creation of a partnership with respect to the "Fasting Buddha."

When questioned about the "anything you say, dear" phrase in another context, Bernice admitted her skepticism as to its authentic transmission of intent, as opposed to a conversational device to diffuse an argument. In any case, the statement is far too offhand to convert the security for a $127,000 loan into a partnership share in a work of art said by some to be worth over $1.0 million, given the absence of any writing or other action to corroborate the partnership. Further, Dara, who was offered as a witness by Bernice, testified that after the London trip Bernice had told him that she had proposed a partnership in the Fast-

ing Buddha to Julian and that the proposal had been rejected.

Julian was about to leave again for Pakistan and Japan to investigate the possibility of acquiring an Afghan silver collection and what was referred to as the "Tokyo Buddha." Bernice offered her good wishes. Upon arrival in Pakistan, Julian found the silver collection unavailable, was introduced to a new dealer, saw the Princely Buddha and the Elongated Buddha. Bernice agreed to send $150,000 to purchase them and suggested that the Garuda group be sold by Julian to the Met for $35,000, to raise the amount necessary for the deposit. It was suggested that the Met might use her $35,000 contribution for a purchase from Julian of one of his pieces, and that was arranged. Since the payment was delayed by the bureaucratic processes of the Met for some 5 or 6 weeks, Bernice advanced Julian the $35,000. Julian made a down-payment by way of deposit in the account of Shave Ram, the shadowy money lender to whom on occasion Wolff had also made payments for Gandharan art. Julian repaid Bernice after he received the money from the museum. The money according to Julian went toward the purchase of the Princely and Elongated Buddhas. Julian then proceeded to Japan. The correspondence from Japan clearly indicates a romantic involvement, certainly as far as he was concerned, whether or not sincere.

Two weeks later Julian returned to Pakistan. Bernice transferred approximately $150,000 to Julian, it was exchanged for Rupees, and $130,000 in Rupees was paid to Siddik, Shah and a Mr. Shiraz Gul, and approximately $20,000 was spent to have the pieces transported out of Pakistan. Julian left Pakistan and returned to London. He sought an additional $100,000 from Bernice, who refused payment, stating that she understood her commitment to be limited to $150,000. In September, 1980 the pieces arrived in New York.

Both agree that the initial price referred to was $200,000. Julian testified that the final price agreed upon for both Buddhas was $250,000 and Bernice testified that the

only price she heard from Julian was $150,000. Julian's version of the purchase price gains support from the testimony of Wolff who testified that an aggregate purchase price of $250,000 in Pakistan for the two Buddhas was very good. He also testified that their value to a willing buyer and seller in New York at the time was between $150,000 and $400,000 for the Elongated Buddha and between $275,000 and $400,000 for the Princely Buddha. Wolff was an entirely credible witness, direct and knowledgeable. His valuations for a willing buyer and seller are found to be accurate.

Meanwhile, one of those acts of trust by Bernice, the delivery of the Padmapani Bronze to Heller for inclusion in the transaction, was converted by an unfortuitous and unexpected event, the theft of the Bronze, into an irretrievable loss of faith in the relationship between Julian and Bernice. On a hot evening in July, 1980, teenage members of Heller's family admitted a young neighborhood bicycle rider into the Heller home. When the host departed to get some chocolate milk, the guest departed with the Padmapani Bronze. Fortunately, Heller had invoiced the piece for $90,000, and insurance proceeds were forthcoming. Julian was advised of the loss and was most anxious to obtain the proceeds to help in the resolution of his problems relating to the Princely and Elongated Buddhas. He received the first two checks totalling approximately $28,000, but Heller stopped payment on one check for approximately half of that amount. Although Julian spoke with Bernice during this period, these events were not disclosed to her.

Bernice in the meantime had become concerned about the progress of the Heller deal and decided to remove the Padmapani Bronze from consideration. She called Heller seeking its return. After some hesitation, the events of the summer evening and the consequences were disclosed. She became distraught, claimed her interest in the insurance proceeds and in the Fasting Buddha. Julian's use of the proceeds without disclosure to her terminated her trust in

him and their future, and certainly in any financial arrangement they had.

Bernice commenced restoration on the Princely and Elongated Buddhas. At some time in 1980, Heller visited her home as he had in the past when he first inspected the Fasting Buddha. He looked at the Standing, Seated, Princely and Elongated Buddhas. According to Heller, Bernice advised him that she and Julian were partners in all the pieces except the Standing Buddha which was hers. In fact, as set forth above, both the Standing and the Seated Buddhas were acquired on the same basis. Bernice refused to see Julian when he arrived in New York in September, 1980.

In November, a document arrived from Siddik pleading for the completion of the payments for the Elongated and Princely Buddhas and alluding to the kidnapping of his family. The possibility of the kidnapping of Julian's family was mentioned in telephone conversations which Julian repeated to Bernice. Julian sought help from Bernice, certain questioned documents arrived relating to the purchase, and Bernice refused to pay over any additional funds. Finally Julian was able to sell a Gandharan Bronze for $150,000, $116,000 of which was forwarded to Pakistan and deposited in the Shave Ram account. Julian's testimony is credited insofar as he claims he used these funds to pay the $65,000 outstanding balance on the purchase price of the Princely and Elongated Buddhas, and $11,000 in interests and fines. Also credited is his testimony that $35,000 was wired to the account of Siddiki to be allocated to the purchase price ($20,000) and export charges ($15,000). Not credited, financially or otherwise, is the so-called ransom payment of $40,000.

Bernice by her skilled counsel has pointed out that the form of the transactions in Pakistan are unconfirmed by reliable documentation, that Julian had in the past bartered pieces, that the prices in particular for the Princely and Elongated Buddhas were stated to be different in amount at differ-

ent times, and that it is entirely possible that the objects were acquired in a different fashion and time than as described by Julian, all of which is uncontrovertible. However, Julian's testimony as to the method of dealing in Pakistan was corroborated by Wolff, and Julian's version of the transaction cannot be rejected solely on the basis of Bernice's hypothesis which fails, understandably, to be established by objective facts regardless of its logic. Strictly as a matter of proof, even if Julian's testimony were to be disregarded in its entirety as untruthful, which it is not, Bernice has not been able to establish what did happen in Pakistan. Her suspicions, however, in the fall of 1980 were such, confirmed in her mind by the initially undisclosed appropriation of insurance proceeds for the Padmapani Bronze, that she could no longer trust Julian, particularly with objects having a current value in excess of $1.4 million.[5]

Lawyers were consulted, conferences held in 1981 in an effort to resolve the impasse in a fashion not revealed to the court, and in June of 1982 Julian sold a number of pieces and entered into a contract to sell the Fasting Buddha for $300,000. Bernice rejected the suggestion and refused to release the piece, and this litigation, the bitter denouement of the relationship of trust, followed.

### Conclusions of Law

The facts, as found above, concern a unique relationship in which valuable art objects were involved. In this mixture of love and art acquisition there are no written documents defining the relationship in customary legal terms. With respect to the Fasting Buddha, Julian admits that the object is security for the $127,000 loan entered into in April, 1979. As such, upon payment of the loan Julian will be entitled to possession of the object, the Fasting Buddha not having been converted into a partnership interest by an "anything you say, dear."

---

**5.** Wolff's testimony of a value of $300,000 for the Standing Buddha, $100,000 for the Seated Buddha and $350,000 each for the Princely and Elongated Buddha is credited. The value of the Fasting Buddha is in excess of the contract price of $300,000.

Regarding the proceeds from the Padmapani Bronze, Julian has failed to prove by a preponderance of credible evidence that the parties agreed to divide the profits on any sale or disposition of the Bronze. Instead, the evidence adduced at trial indicates that the transaction was a relatively straightforward sale by Julian to Bernice. Therefore Bernice is entitled to all of the insurance proceeds from the Bronze.

The resolution of the ownership of the Standing and Seated Buddhas and the Princely and Elongated Buddhas is much more complicated. According to Julian, both parties agreed that Bernice, because of her substantial resources, would furnish the necessary capital, and that Julian would furnish his skill, expertise, experience and contacts in order to acquire the objects which would there be displayed for sale at Bernice's townhouse. Julian claims that the proceeds of sale were to be divided equally after each party received a return on his or her investment, and that any loss incurred on the sale of an item would be offset against the profits from the sale of future items. Bernice urges that such an arrangement never existed and that she simply financed Julian's trips and provided him with funds to make purchases for her.

The acquisition of art objects by Bernice and Julian was romantically initiated and ultimately terminated in distrust and deception. The facts recited above hardly fit the description of a "garden variety" joint venture, if a joint venture at all. Although joint venture analysis appears to be the most appropriate here, it is at times difficult to separate the elements of emotional investment and expectation from the financial aspects of the arrangement between Julian and Bernice. The task is even more difficult because the testimony of each on the crucial issues of intent, control, and profit and loss sharing, was in direct conflict, and neither Bernice nor Julian was completely credible during the trial. Beyond the testimony adduced at trial, the only documentation on these issues is found in Julian's letters, and even there, the messages are often ambiguous and of course one-sided, Julian having destroyed all of Bernice's correspondence. However, the conduct, contemporaneous statements, and present testimony of the parties, together with all the facts and circumstances in evidence as found above, permit the court to draw certain significant inferences with respect to the existence of a joint venture.

Under the laws of the State of New York, a "joint venture" is generally defined as a special combination of two or more persons wherein some specific venture a profit is jointly-sought without any actual partnership or corporation designation. *Chalmers v. Eaton Corp.,* 71 A.D.2d 721, 419 N.Y.S.2d 217 (3d Dep't 1979). "The ultimate inquiry is whether the parties have so joined their property interests, skills, and risks that for the purpose of the particular adventure, their respective contributions have become one and the commingled properties and interest of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." *Hanlon v. Melfi,* 102 Misc.2d 170, 423 N.Y. S.2d 132 (Sup.Ct., Suffolk County 1979). The crucial factors to be considered are the intent of the parties, express or implied, whether there was joint control and management of the business, whether there was sharing of profits and losses, and whether there was a combination of property, skill or knowledge. *Ramirez v. Goldberg,* 82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dep't 1981). Finally, a joint venture may be created by an oral agreement. *Chalmers, supra.*

Julian's financial condition was dismal when he met Bernice. Although her loan helped him make Rossminster payments, his despair over his financial condition continued throughout the duration of their relationship. It is true that Julian stood to gain even under Bernice's version of their business relationship: he would get an "all-expenses-paid" trip to Pakistan; he would have the opportunity to establish his credentials with major dealers in Gandharan art; and he would have the opportunity

perhaps to escape temporarily from his marital misfortunes. However, there is no question but that Julian intended primarily to reap some profit from the sale of the Buddhas. He needed money badly, and the purchase and sale of Gandharan art was the ideal way for him to make it.

Bernice is a wealthy woman. There is no evidence that at the time she met Julian she was actively seeking to enhance her financial position. Bernice certainly was not a dealer in Gandharan art and had no demonstrated interest in it prior to meeting Julian. She did have a strong interest in Julian and their relationship and was a devoted and generous lover and friend, willing to give of herself emotionally, to make the romance work, and financially, to assist in Julian's effort to climb out of his financial hole.

These facts form the framework for Bernice and Julian's financial arrangements. The possibility of a joint venture was discussed during their trip to Massachusetts and thereafter with the Paones at a luncheon. In a letter to Peter, Julian wrote, "If ever I want to purchase something major in my field . . . she's prepared to put up the capital and do it on a partnership basis." In his letters to Bernice, Julian referred to the purchases as "their investments," and their relationship as that of "partners." On several occasions when Bernice expressed her distrust, Julian offered the return of her money, a course he described as "less messy [which would] only mean that one partner had thought better of the venture and opted out." Heller, Bernice's witness, indicated that in discussing her business relationship with him, Bernice had discussed her and Julian's joint interests in at least some of the art objects, and it has already been noted that all four Buddhas were purchased in roughly the same manner, allowing the inference to be drawn that that they were all part of the same financial arrangement.

The purchases were made with an eye towards ultimate resale. Bernice's townhouse was the sensible place to display them—for resale in New York and presumably to avoid further entanglement with Elizabeth in London. Bernice undertook restoration of the pieces and had them photographed for resale.

While Julian was not simply an art dealer venturing to make purchases for a mere client as an integral part of a strictly business relationship, there is no reason why two people emotionally involved cannot create an enforceable joint venture. This case has certainly highlighted the difficulty of isolating, analyzing and proving the financial motivations of individuals whose relationship is simultaneously blessed with romance and cursed by frustration, uncertainty and distrust. While inconsistencies and contradictions persisted throughout the trial, I conclude that on the record as a whole, Julian has proved by a preponderance of credible evidence that Bernice and Julian were co-venturers with respect to the four Buddhas, pursuant to an oral agreement with terms as described by Julian.

As indicated earlier, Julian is the owner of the Fasting Buddha and is entitled to possession thereof upon payment to Bernice of the $127,000 loan plus interest at the highest personal loan rate prevailing in New York. Bernice, as owner of the Padmapani Bronze, is entitled to all insurance proceeds issued as a result of the theft.

The joint venture was terminated in the fall of 1980 when Bernice learned from Heller that the Padmapani Bronze had been stolen. Upon dissolution or termination of a joint venture or partnership, the parties generally seek an accounting by enlisting a court of equity to vindicate the rights of the co-venturers. *See Arrants v. Dell Angelo,* 73 A.D.2d 633, 422 N.Y.S.2d 761 (2d Dep't 1979); *Yonofsky v. Wernick,* 362 F.Supp. 1005 (S.D.N.Y.1973). Each party establishes the amounts contributed, and each is entitled to a return of such contributions before a division of the assets is made. *Gordon v. Ginsberg,* 22 A.D.2d 944, 255 N.Y.S.2d 966 (2d Dep't 1964). The amounts contributed by Julian and Bernice are set forth in the findings of fact above. Division of profits is more difficult since the art objects are not typical assets of a conven-

tional joint venture. Because of the special nature of the assets involved here, I will not direct liquidation, that is, the immediate sale of the Buddhas. Instead, this court sitting in equity directs the following equitable, albeit unconventional, distribution of the Buddhas, a distribution based upon the terms of the agreement specifying that the profits be divided equally after each party receives a return on his or her investment.

Bernice is declared the owner of the Seated and Standing Buddhas and Julian of the Princely and Elongated Buddhas. Wolff's testimony on the current market values is credited, to the effect that the Standing and Seated Buddhas are worth $300,000 and $100,000 respectively, and the Princely and Elongated Buddhas $350,000 each.

Bernice paid $160,000, the purchase price of the first two Buddhas, and $34,000 in expenses. Julian paid $21,000 in expenses. Therefore, the total cost of the Standing and Seated Buddhas was $215,000. The current value of the two minus cost yields a profit of $185,000. Bernice, who will keep the Seated and Standing Buddhas, owes Julian one-half the profit plus the amount of his contribution, or $113,500.

With respect to the Princely and Elongated Buddhas, Bernice contributed $148,400 to the purchase price and Julian, $100,000 to the purchase price and $46,000 in expenses. The current value of the two minus cost yields a profit of $405,600. Julian, who keeps the Princely and Elongated Buddhas, therefore owes Bernice one-half the profit plus the amount of her contribution, or $351,200. On a net basis, Bernice is entitled to a money judgment of $237,700 in connection with the termination of the joint venture, with interest from the date of entry of the judgment.

Settle judgment on notice in ten (10) days.

IT IS SO ORDERED.