**John McGHAN, Plaintiff,**

v.

**Dick EBERSOL and No Sleep Productions, Inc., Defendants.**

**No. 84 Civ. 1316 (RWS).**

United States District Court,
S.D. New York.

April 12, 1985.

---

Pryor, Cashman, Sherman & Flynn, New York City (Donald S. Zakarin, Philip R. Hoffman, David A. Nicholas, New York City, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (Eugene L. Girden, Esther Koslow, New York City, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Plaintiff John McGhan ("McGhan") brought this suit against defendants Dick Ebersol ("Ebersol") and No Sleep Productions, Ltd. ("No Sleep") alleging violation of a joint venture agreement and misappropriation of ideas. The defendants have now moved for summary judgment, and McGhan has cross-moved for partial summary judgment. For the reasons discussed below, the defendants' motion is granted and McGhan's motion is denied.

**Facts**

This action arises out of the creation of a popular television series called "Friday Night Videos" ("FNV"), a music video show broadcast over the NBC Television Network on Friday nights. FNV is owned by No Sleep, of which Ebersol is an officer and sole owner. Ebersol is a well-known television producer who has established a reputation for his success with late night television programming, in particular for his efforts with the variety and comedy show "Saturday Night Live" and the rock music show "Midnight Special." McGhan has been involved in the radio and music industry for over a decade, in particular as creator and producer of a youth radio network called "The Source" owned by NBC radio, as director of Rolling Stone Magazine Productions, a radio syndication company, and as creator of the successful radio show Rolling Stone Magazine's Continuous History of Rock & Roll.

FNV was first conceived in August of 1982, when Ebersol approached Brandon Tartikoff ("Tartikoff"), NBC's president of Entertainment, to try to persuade him to replace a failing late night comedy show called "SCTV" with a music video show. Although Tartikoff expressed some interest he was not prepared to take action at that time. In late November, 1982, Ebersol's interest in the project was revived after observing a network news broadcast on the success of Music Television Video ("MTV"), a cable television channel which broadcasts music videos on a 24-hour basis. He again approached Tartikoff with the concept of a music video show.

During the course of conversations over the next few days, Tartikoff expressed considerable interest in the project and suggested that Ebersol come up with a written presentation laying out those elements that would distinguish the NBC show from MTV. Tartikoff subsequently obtained approval to replace SCTV with Ebersol's series, although the parties dispute whether any binding commitment was made at that time. According to Ebersol, they also decided that even though no pilot was needed because the series would use MTV as a pilot, the series would fulfill a commitment that NBC had earlier made to Ebersol to fund any future pilot he might propose.

Ebersol then contacted McGhan, whom he had met while Ebersol was at Saturday Night Live and McGhan was at The Source and with whom he had discussed the possibility of a simulcast of a musical performance on "Saturday Night Live." Ebersol described the proposed show as including top videos and interviews and asked McGhan if he would be capable of producing the show. After McGhan said he was, Ebersol asked him to put together a document incorporating any ideas for the shows. Several days later, McGhan presented Ebersol with a document entitled "Loose Thoughts" in which he set forth various ideas for the show, and a few days after that an expanded proposal entitled "Video Rock." McGhan and Ebersol have differing recollections as to the degree of enthusiasm with which these documents were received by Ebersol. They also contest the degree to which these documents reflected McGhan's original concepts for the video show rather than Ebersol's initial proposals.

McGhan concedes that he and Ebersol never specifically discussed ownership of FNV, but contends that Ebersol conveyed

to him the understanding that McGhan would be an owner of FNV. Ebersol asserts that it was his understanding that McGhan had agreed on an employment relationship when Ebersol asked him if he could produce the show. Neither party has referred to any specific discussion concerning the nature of their relationship to each other or to the show.

In mid-January 1983 Ebersol and McGhan had a series of meetings to prepare a final proposal to be sent to NBC. As a result of these meetings, a document entitled "A New Late Night Project" was prepared and sent to Tartikoff which incorporated the ideas laid out in "Video Rock" and included several additional ideas. In mid-February, Ebersol and McGhan met with Tartikoff and other NBC executives to discuss the show. According to McGhan, the question of whether or not NBC would own the show was raised at the meeting but not resolved because of a concern about union payments. McGhan contends that following the meeting Ebersol told McGhan that there would be more profit if they owned the show as opposed to NBC, and also assured him that the show would be very lucrative for both of them.

In the weeks following the meeting, a variety of changes and deletions were made before the final format used in the July 29, 1983 premiere was agreed upon. McGhan worked for Rolling Stone until his position was eliminated in February of 1983. After that he worked exclusively on FNV. McGhan contends that he turned down other offers of employment to work on FNV. The quality of work performed by McGhan from February on is disputed. According to Ebersol, problems developed between McGhan and Ebersol right from the start. Ebersol claims that although he specifically instructed McGhan not to negotiate or discuss money with record companies, McGhan entered into commitments with David Benjamin ("Benjamin") of CBS Records that later had to be renegotiated.

According to Ebersol, by May of 1983 Ebersol was convinced that McGhan was not qualified to be the producer of a net-work television show, and offered the job to Benjamin. At that point, McGhan was told that he could be the coordinating producer. According to McGhan, Ebersol told him at this time that McGhan had no ownership interest in the show. McGhan states that despite this, he chose to stay with the show because of his financial position and the time he had already put in. McGhan informed Ebersol that his friend Dennis Somach ("Somach") would negotiate his position on the show for him.

Somach first informed Ebersol's attorney, Michael Rudell ("Rudell"), that McGhan wanted a salary of $10,000 for each show and $25,000 for all of McGhan's pre-production services. On June 3, 1983, Somach agreed to $2,750 salary for each new show. According to Ebersol, he also agreed to $3,500 for all of McGhan's pre-production efforts. The parties dispute whether Somach ever sought to obtain an ownership interest in the show for McGhan. Somach did seek profit participation for McGhan in "ancillaries" (spin-offs) and merchandising, but Rudell advised him that Ebersol would not agree to it. Rudell then arranged for a draft of a contract entitled the "Coordinating Producers Agreement" and incorporating the agreement reached between Somach and Rudell to be sent to McGhan's attorneys, Stephen Rodner ("Rodner") and Alan Siegel ("Siegel"). After speaking with McGhan his attorneys requested an ownership interest but were rebuffed. Rudell disputes that this request was ever made. In any event, McGhan subsequently instructed them not to press the issue and to continue to negotiate for him, and made various suggestions and requests that were transmitted to Rudell. During this time period McGhan accepted $2,750 for each of the two shows produced. He also accepted $3,500, an amount Ebersol claims was intended to cover all of McGhan's pre-production efforts but which McGhan asserts was merely his share of the pre-production money paid by NBC. This payment was made following receipt of an invoice from McGhan to Ebersol in which McGhan asked for payment for "services rendered during January 1983 for

your company's new project." Def. Ex. 11. McGhan testified that he arbitrarily selected that month to avoid any problems with his having collected unemployment insurance during the following months. He stated that he performed no services in January 1983.

On August 16, 1983, before any employment agreement had been signed, McGhan was informed by Benjamin that he had been dismissed. On that same day, his attorneys telephoned Ebersol's attorneys and said that McGhan was asserting a "proprietary" interest in FNV. Six months later, McGhan filed the complaint in this action asserting an ownership interest in both the show and in the original ideas he contends he contributed to the show, and charging Ebersol with violating a joint venture agreement and with misappropriating McGhan's original ideas.

**Discussion**

In this motion, Ebersol has moved for summary judgment on the grounds that McGhan has not provided sufficient evidence of the essential elements of a joint venture, that McGhan has not established the existence of a legal relationship that would entitle him to ownership of any ideas he may have contributed to FNV, and that in any event, none of McGhan's ideas were sufficiently original to allow him to assert a proprietary interest.

**Joint Venture**

 Under New York law, a "joint venture" is defined as "an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; a combination of property, efforts, skill and judgment in a common undertaking." *U.S. v. Standard Oil Co.*, 155 F.Supp. 121, 148 (S.D.N.Y.1957), *aff'd*, 270 F.2d 50 (2d Cir.1959); *see Chalmers v. Eaton Corp.*, 71 A.D.2d 721, 419 N.Y.S.2d 217 (3d Dept.1979). "The ultimate inquiry is whether the parties have so joined their property interests, skills, and risks that for the purpose of the particular adventure, their respective contributions have become one and the commingled properties and interest of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." *Hanlon v. Melfi*, 102 Misc.2d 170, 423 N.Y.S.2d 132 (Sup.Ct., Suffolk County 1979). In order to find a joint venture, "[t]he crucial factors to be considered are the intent of the parties, express or implied, whether there was joint control and management of the business, whether there was sharing of profits and losses, and whether there was a combination of property, skill or knowledge." *Sherrier v. Richard*, 564 F.Supp. 448, 457 (S.D.N.Y.1983), *citing Ramirez v. Goldberg*, 82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dep't 1981). The most important element in a joint venture is the existence of a contract or agreement; "An agreement between the parties to create a joint venture is essential and whether or not a joint venture exists depends entirely upon the intention of the parties, either express or implied." *Yonofsky v. Wernick*, 362 F.Supp. 1005, 1031 (S.D.N.Y.1973), *citing U.S. v. Standard Oil Co., supra*, 155 F.Supp. at 148. A joint venture may be created by oral agreement or implied by conduct. *Sherrier v. Richard, supra; Wooten v. Marshall*, 153 F.Supp. 759, 765 (S.D.N.Y.1957).

In the case at hand, McGhan asserts that he has presented sufficient evidence to require a conclusion that there is a genuine issue of material fact as to the existence of an agreement between himself and Ebersol. According to McGhan, both Ebersol's use of certain words in his discussions with McGhan and the conduct of McGhan and Ebersol indicate that the parties intended to be joint venturers. In particular, he repeatedly points to Ebersol's use of the collective terms "we" and "us" when discussing FNV with McGhan. He notes that Ebersol told him that he needed someone to work with him, not for him, that he suggested that the show would be lucrative for both of them and that at one point he told McGhan there would be more profit if they owned the show as opposed to NBC, and that if NBC owned it, it would have to buy out their interest in the show. He also

points to Ebersol's use of the words "our entire program" and similar collective pronouns in the proposal entitled "New Late Night Project" that was submitted to NBC.

In addition, McGhan suggests that Ebersol's actions demonstrate that he and McGhan intended to be joint venturers or that at the very least Ebersol attempted to convey that impression to McGhan. In support, he points to the fact that Ebersol solicited McGhan's ideas, that McGhan was present at the February 1983 meeting with NBC, and in particular to the fact that McGhan worked for four months on the show without any payment or promise of payment. He contends that it is illogical to assume that someone who had been making a salary of $100,000 a year would have been willing to work without pay just for the possibility of obtaining future employment. McGhan also points to the fact that both Somach and Siegel testify that McGhan told them he was a co-owner of FNV.

■ McGhan has failed to provide enough evidence to create a genuine issue of material fact as to the existence of an agreement. In order to find a joint venture, "there must be specific agreement that the individuals are engaging in a joint enterprise ... the agreement must manifest the intent of the parties to be associated as joint venturers." *Yonofsky v. Wernick, supra,* 362 F.Supp. at 1021. The fact that Ebersol used plural rather than singular pronouns is not enough to establish that Ebersol intended to enter into a joint venture with McGhan. While McGhan cites cases where the parties' language was taken into consideration in determining whether or not an agreement existed, *see, Sherrier v. Richard, supra; Forman v. Lumm,* 214 A.D. 579, 212 N.Y.S. 487, 491 (1st Dept. 1925), both involve situations where the parties referred to their relationship as a partnership or used similar language that went considerably beyond the use of collective pronouns. Furthermore, McGhan himself referred to FNV as "your new project" in the invoice he sent to Ebersol. Nor does Ebersol's decision to ask McGhan for input

or to include him at meetings represent probative evidence of his intent. While McGhan's decision to work on FNV without pay suggests that he felt he would eventually be compensated in a manner that would justify his decision, it does not provide proof of any agreement. McGhan himself testified that he did not have a clear understanding as to ownership after his initial meetings with Ebersol and that it was a "nebulous" agreement, although he felt positive that Ebersol had intentionally implied that McGhan would have an ownership interest. At no time was ownership ever discussed.

■ In addition, McGhan's arguments are undercut by the fact that he negotiated for an employment contract and accepted payment in accordance with that contract, even though it was never signed. Whether or not the check for $3,500 that McGhan received was actually in payment for all of his pre-production services, a conclusion that seems likely given that that was the sum so designated in the contract, or merely a payment from NBC's production budget, his acceptance of a set payment per show in accordance with an employment contract is inconsistent with his claims. McGhan claims that the employment contract is irrelevant to his assertions of an ownership interest, because he only began his employment negotiations to protect his financial interests when he realized for the first time that Ebersol would not voluntarily give him an ownership interest. Given the lack of evidence of any prior understanding as to a joint venture, however, McGhan's willingness to negotiate for an employment contract does not support his claim of ownership.

Furthermore, McGhan has offered no proof of an agreement to share profits or losses, an essential element of a joint venture relationship. *See Mallis v. Bankers Trust Co.,* 717 F.2d 683, 690 (2d Cir.1983); *Yonofsky v. Wernick, supra,* 362 F.Supp. at 1031. Ebersol testified that he spent between ten and twenty thousand dollars on the show before NBC agreed to pay pre-production costs. There is no evidence

that Ebersol asked McGhan to bear any of those expenses or that there was any expectation on McGhan's part that he might be required to participate in any losses incurred. McGhan stated that he believed that there would be no risk of loss because NBC would put up any initial costs. However, his belief that the show would not involve a loss does not represent proof of any agreement to share profits or losses.

Additionally, McGhan has failed to establish another crucial element of a joint venture, namely, that the parties have "joint control and management of the business." *Ramirez v. Goldberg*, 82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dept.1981); *Yonofsky v. Wernick*, *supra*, 362 F.Supp. at 1031. McGhan himself conceded that his powers and responsibilities were limited by Ebersol and that he was not able to operate outside of Ebersol's direction and control. Unlike Ebersol, he did not have the power to hire or to enter into binding contracts.

The evidence that McGhan has presented may be sufficient to support the conclusion that at least up until May 1983 McGhan believed that he was entitled to something in the form of an interest in the show. But the evidence cannot support a finding of an implied agreement by both parties to enter into a joint venture. The reasoning of the district court in *Yonofsky v. Wernick, supra,* is equally applicable here:

> Viewed in the light most favorable to plaintiff, the testimony reveals that [plaintiff] was promised something by defendant if he aided [defendant] ... [b]ut that something was never clearly revealed; it certainly was not a fifty-percent interest in defendant's business. Perhaps it was a promise of employment, but even this was never definitely worked out between the parties. Whatever arrangement may have existed between the parties was at best vague and indefinite.

362 F.Supp. at 1036. The evidence does not reveal that the parties had any definite arrangement or understanding of their relationship between the time that Ebersol first approached McGhan and the point at which Somach began to negotiate McGhan's contract. Having failed to adequately protect his own interests, McGhan cannot now rely on this court to provide that protection. Because he has not provided evidence that could establish the existence of any of the essential elements of a joint venture, Ebersol's motion for summary judgment is granted as to McGhan's claims relating to a joint venture.

**Misappropriation**

In certain situations, the courts of New York will "afford protection to persons who ... have disclosed their ideas to others in the expectation that the idea would be used, and the use compensated." *Vantage Point, Inc. v. Parker Brothers, Inc.*, 529 F.Supp. 1204, 1216 (E.D.N.Y. 1981), *aff'd without op. sub. nom. Vantage Point, Inc. v. Milton Bradley*, 697 F.2d 301 (2d Cir.1982). In order for an idea to be susceptible to a claim of misappropriation, two essential elements must be established: the requisite legal relationship must exist between the parties, and the idea must be novel and concrete. The legal relationship between the plaintiff and defendant may be either a fiduciary relationship, or based on an express contract, an implied-in-fact contract, or a quasi-contract. *Id.* at 1216–17.

Ebersol first contends that McGhan's claim must fail because he was fully compensated for any ideas that he allegedly contributed. In support, he asserts that the payment of $3,500 that McGhan received in June of 1983 was in payment for all services, including the creation of ideas, provided by McGhan up until production began. However, McGhan disputes this characterization of the $3,500 payment. Although the "Coordinating Producer's Agreement" provides for the payment of this sum for pre-production services, there is no indication that the parties intended "services" to include the development of original ideas for use on the show. The contract also provided that Ebersol would own all ideas contributed to the show that were used, although McGhan could retain ownership of all unused ideas.

However, the contract was never signed and thus may serve only as evidence to be submitted to the trier of fact. The degree to which McGhan was actually compensated for his original ideas, if any, raises a genuine issue of material fact that cannot appropriately be resolved on a motion for summary judgment.

■ Ebersol also contends that no issue of material fact is presented as to whether a fiduciary relationship or an implied-in-fact or implied-in-law contract existed between the parties. However, while the evidence submitted is not enough to support the conclusion that the parties entered into a joint venture, it does create a factual issue as to the actual nature of the relationship that existed between the parties. A confidential or fiduciary relationship exists between parties "where the parties do not deal on equal terms and one trusts and relies on the other." *Sachs v. Cluett, Peabody & Co.,* 265 A.D. 497, 39 N.Y.S.2d 853, 856 (1st Dept.), *aff'd,* 291 N.Y. 772, 53 N.E.2d 241 (1944). Ebersol contends that because McGhan was represented by sophisticated and experienced persons, including attorneys, when his employment contract was negotiated, there was a pattern of equality and arm's length negotiations. However, there is no evidence that McGhan was represented by anyone between November 1982 and May 1983, and the circumstances and nature of McGhan and Ebersol's dealings during that time might support the conclusion that McGhan relied upon Ebersol to protect his interests. Thus, a question of fact is presented as to the extent to which a fiduciary relationship existed. *See Cole v. Phillips Lord, Inc.,* 262 A.D. 116, 28 N.Y.S.2d 404, 410 (1st Dept.1941); *Klein v. Ekco Productions Co,* 135 N.Y.S.2d 391, 395–96 (Sup.Ct. Kings Co.), *aff'd,* 285 A.D. 906, 139 N.Y. S.2d 258 (1954).

■ Similarly, the evidence as to the circumstances surrounding their relationship might support the conclusion that the parties had entered into an implied agreement that McGhan would be fairly compensated for any original ideas that he might contribute. An implied-in-fact contract may be based upon industry custom or usage regarding submission and use of ideas. *See Vantage Point, Inc. v. Parker Bros., Inc., supra,* 529 F.Supp. at 1216; *Bevan v. CBS,* 329 F.Supp. 601, 608 (S.D.N. Y.1971). A determination as to the existence of such an implied agreement must be made by the trier of fact by examining the manner in which Ebersol and McGhan conducted themselves in light of ordinary industry practice as to use of ideas. Finally, the degree to which Ebersol's actions with respect to McGhan were sufficiently improper and his enrichment sufficiently unjust so as to entitle McGhan to compensation on a quasi-contract basis is also a question of fact. Because the issue of the nature of the relationship established between the parties raises genuine issues of material fact, it cannot be resolved on a motion for summary judgment.

Even if McGhan successfully establishes the existence of the requisite legal relationship between himself and Ebersol, however, he must also establish that the ideas for which he seeks compensation were both novel and concrete. McGhan contends that he created the following ideas for FNV and that all of them are novel:

(1) "The Reel Rock Awards" (video awards)

(2) "Where Are They Now" (with Ebersol) (interviews with rock stars of yesteryear)

(3) "The Video Vote" (a 900 call-in number for viewers to call and vote on videos)

(4) "Private Reels" (Rock group's private footage)

(5) Stereo simulcast of a network series on a continuing basis

(6) "Hall of Famers" (tributes to classic rock musicians and bands)

(7) A highly stylized announcer rather than an on-screen host

■ An examination of McGhan's deposition testimony, however, reveals that he is unable to claim compensation for any of these ideas. At his deposition, McGhan

admitted that the "Reel Rock Awards" segment was never used on FNV (McGhan Tr. at 221, 259). A plaintiff cannot recover for misappropriation of ideas unless the ideas are actually used by a defendant. *Seymore v. Readers Digest Ass'n., Inc.*, 493 F.Supp. 257, 265 (S.D.N.Y.1980); *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc.2d 412, 317 N.Y.S.2d 840, 843 (Sup.Ct. N.Y.Co.1970). McGhan also admitted at his deposition that the "Where Are They Now" segment, a segment dropped after the first show, was "absolutely Dick's idea" (McGhan Tr. at 227), although in his affidavit submitted in opposition to this motion he now claims it as his own. (McGhan Aff. ¶ 20). The Second Circuit has held that a discrepancy between deposition testimony and affidavits will not preclude summary judgment:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Perma Research and Serv. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969). Based on McGhan's deposition testimony, he has no right to claim ownership of the "Where Are They Now" segment.

 As to the 900 number "Video Vote" segment, which was also dropped by the show, McGhan conceded in his deposition that MTV had featured a 900 number "Video Fight" before FNV was ever aired and that a 900 call in vote had already been used by Ebersol on SNL. McGhan Tr. at 70, 491–92. While it is true that the fact that a plaintiff's idea "embodies elements long in use does not of itself negate originality or novelty," *Baut v. Pethick Const. Co.*, 262 F.Supp. 350, 361 (M.D.Pa.1966), in order to be protectable, adaptions of ideas must:

> show genuine novelty and invention, and not a merely clever or useful adaption of existing knowledge ... [t]he judicious use of existing means or the mixture of known ingredients in somewhat different proportions—all the variations on a basic

theme—partake more of the nature of elaboration and renovation than of innovation.

*Educational Sales Programs, Inc. v. Dreyfus Corp., supra*, 317 N.Y.S.2d at 844 (citation omitted). Furthermore, a plaintiff may not claim that an idea is novel if the idea was already in use in the industry at the time of plaintiff's submission or if the defendant himself had already used that idea. *See Bram v. Dannon Milk Prods.*, 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1st Dept. 1970); *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (Ct.App.1972). In this case, Ebersol had already made use of the general idea of a telephone call in on SNL, and MTV had featured the identical element in the context of a music video show. The mere fact that on FNV the idea was used for the first time on a network, rather than cable, television series does not qualify it for protection as novel or original.

 Similarly, the concept behind "Private Reels" was already in use in the industry prior to FNV. The idea that McGhan proposed under the heading "Private Reels"—the viewing of private footage filmed by rock bands and shown only at their concerts—was not used on FNV (McGhan Tr. at 254, 257), and the segment entitled "Private Reels" as it appeared on FNV consists of interviews with various rock stars. McGhan has conceded that MTV has interview segments, (McGhan's Tr. at 124) and that having interviews was one of the first ideas discussed by Ebersol and McGhan (McGhan's Tr. at 86). The idea of interviewing performers or showing them "behind the scenes" cannot qualify as a unique and novel concept.

 The concept of a simulcast is also one that had been used in the industry prior to FNV. As McGhan testified at his deposition, MTV had previously been simulcast over The Source, and SNL had also used a simulcast prior to FNV's origination. McGhan contends, however, that it was he who had first suggested the idea of a simulcast on SNL to Ebersol in 1981, and that in any event a continuing simulcast as a feature of a network television program had never before been attempted. Even

assuming that the concept of a simulcast was McGhan's original and innovative creation while he was at The Source, he cannot now lay claim to the use of the idea on FNV after it has been used in the industry:

If the idea or suggestion is already the subject of general knowledge, or has as its basis an improvement of a standard technique, or better use of existing means, or the "mixture of known ingredients in somewhat different proportions" ... the idea has no value as property....

*Seymore v. Readers' Digest Ass'n., supra,* 493 F.Supp. at 265. The concept of a continuing simulcast as a regular feature of a program may never have been used before FNV, but it represents no more than the "mixture of known ingredients in somewhat different proportions." *See Futter v. Paramount Pictures, Inc.,* 69 N.Y.S.2d 438, 440 (Sup.Ct. N.Y.Co.1947) ("merely combining these obvious elements cannot convert a general idea, which is not novel, into a unique concept.").

 As to the segment entitled "Hall of Famers," the concept of a tribute to classic rock musicians or bands, such as The Beatles, also fails to qualify as a unique or novel concept. Instead, it also represents an "idea or suggestion ... already the subject of general knowledge." *Seymore v. Readers' Digest Ass'n., supra,* 473 F.Supp. at 265. Ebersol testified that MTV had previously aired old musical footage. Ebersol Tr. at 941. In making a determination as to the extent to which an idea can be protected, "the requirements of originality and novelty should be viewed in the entire context in which the elements are used." *Baut v. Pethick Const. Co., supra,* 262 F.Supp. at 361. In the context of a television show focusing exclusively on rock videos and rock stars, the concept of a segment featuring older musicians and bands cannot be considered to be a novel and original idea but instead represents "more of the nature of elaboration and renovation than of innovation." *Educational Sales Programs, Inc. v. Dreyfus Corp., supra,* 317 N.Y.S.2d at 844. McGhan's assertions of originality cannot overcome his failure to provide "some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438 (2d Cir.1980).

 The last element to which McGhan lays claim is FNV's use of an off-camera announcer. Ebersol claims that this cannot qualify as novel because MTV also uses an announcer, although he appears on-camera rather than off screen. McGhan, however, asserts that it is this very distinction between a host and a highly stylized off-camera announcer that makes this element unique. This distinction, however, is not enough to allow McGhan to assert that this idea is his original creation. A litigant opposing summary judgment "may not rest upon mere conclusory allegations or denials." *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). McGhan has not demonstrated that this is an idea that shows "genuine novelty and invention, and not a merely clever or useful adaption of existing knowledge...." *Educational Sales Programs, Inc. v. Dreyfus Corp., supra,* 317 N.Y.S.2d at 844.

 Finally, McGhan cannot rely on the press releases distributed by NBC to promote the show and listing the show as "revolutionary" and containing "a substantial amount of feature material that viewers won't be able to see anywhere else" as proof that he contributed novel ideas to FNV. He has been unable to point to any specific component of FNV that did not have its origin either in MTV or in the industry in general. Because McGhan has failed to produce enough evidence to support the conclusion that he contributed novel and original ideas to FNV, his claim of misappropriation must fail.

## McGhan's Motion for Partial Summary Judgment

In his responsive papers, McGhan asserts that he is entitled to partial summary judgment in the sum of at least $24,750. He bases his claim on the fact that during the course of Ebersol's deposition he testified that as far as he knew both Benjamin and Lou Del Prete ("Prete"), McGhan's successor as Coordinating Producer, were essentially guaranteed payment for their servic-

es for the first 13 week cycle of FNV. Ebersol also stated that he was not aware of any distinctions, with respect to guarantees of payment, as to McGhan on the one hand and Benjamin and Prete on the other. Ebersol Tr. at 812–816. On the basis of this testimony, McGhan asserts that he should be entitled to guaranteed payment for the remaining shows in the first cycle. However, Ebersol also testified that he was not fully aware of the provisions of the agreements reached with the various parties and deferred to the more complete knowledge of his lawyer, Rudell. Furthermore, a "play or pay" provision was something that McGhan's representatives attempted unsuccessfully to include in the draft contract. There is no evidence that Ebersol and McGhan ever agreed on such a provision. The mere fact that Ebersol was unclear as to what provisions were included in McGhan's proposed contract does not entitle McGhan to exactly the same provisions as his successors.

For the reasons discussed above, Ebersol's motion for summary judgment is granted and McGhan's motion is denied. The case is dismissed and the clerk is directed to enter judgment.

IT IS SO ORDERED.