**Hwesu S. MURRAY, Plaintiff,**

v.

**NATIONAL BROADCASTING COMPANY, INC., Brandon Tartikoff, The Carsey–Werner Company, a California partnership, Marcia Carsey and Thomas Werner, Defendants.**

**No. 85 Civ. 7675 (MGC).**

United States District Court,
S.D. New York.

July 15, 1987.

Santora & McKay, New York City, by Joseph J. Santora, Michael S. Allen, for plaintiff.

Cahill Gordon & Reindel, New York City, by Thomas R. Jones, Susan Buckley, Lisa Pearson, Ellen L. Weintraub, for defendants Nat. Broadcasting Co., Inc. and Brandon Tartikoff.

## OPINION

CEDARBAUM, District Judge.

On September 30, 1985, Hwesu S. Murray ("Murray") commenced this suit against the National Broadcasting Company, Inc. ("NBC"), Brandon Tartikoff ("Tartikoff"), President of NBC Entertainment, The Carsey–Werner Co. ("Carsey–Werner"), a California corporation, and Marcia Carsey ("Carsey") and Thomas Werner ("Werner"), the principals of Carsey–Werner. The complaint alleges that defendants based the successful and lucrative weekly series *The Cosby Show* on an idea that plaintiff submitted to NBC.

After the completion of discovery by all parties, defendants NBC and Tartikoff moved for summary judgment dismissing the complaint on the ground that "plaintiff's alleged submissions lack the requisite novelty under applicable law." Defendants contend that the lack of novelty in plaintiff's idea is fatal to all of plaintiff's claims. Defendants Carsey, Werner, and Carsey–Werner joined in this motion. Following oral argument of the motion, plaintiff stipulated to dismiss his claims against defendants Carsey–Werner, Carsey and Werner.

## BACKGROUND

Murray, who is black, is 36 years old. He holds a Bachelor of Arts degree in English, a Master of Arts degree in Broadcast Journalism and a law degree. For most of the past 10 years, he has worked in the television industry. (Complaint, ¶ 8). In 1979, NBC hired Murray as a Unit Manager in NBC Sports. His duties include financial analysis, budget control, and other "logistical activities relating to NBC Sports programs." (Complaint, ¶ 9). In 1980, plaintiff submitted proposals to NBC for five television programs. Murray submitted the proposals after conversations with William Dannhauser, an NBC official, who requested that Murray put his proposals in writing. The five proposals were entitled "Father's Day," "Lady Luck," "Movieola," "Fox Theater Review," and

"Temptations/Supremes Reunion." (Santora Affidavit, ¶ 50). Making such submissions was outside the scope of plaintiff's duties as a Unit Manager. (Complaint, ¶ 12).

Plaintiff told Dannhauser that if NBC was interested in any of the proposals, plaintiff expected to be the executive producer and the packager for the program, and to receive proper credits and compensation as the executive producer and creator. Plaintiff also told NBC that the proposals were being submitted in confidence. (Complaint, ¶ 13). On June 27, 1980, plaintiff submitted a cover letter and a one-page proposal entitled "Father's Day" for a program about a black middle-class family. That proposal is the subject of this action.

Dannhauser was particularly interested in developing the Temptations/Supremes show. He requested that Murray "flesh out" the other proposals and submit them to Josh Kane. At the time, Kane was an NBC Vice–President and one of the top two entertainment programming officials of NBC. (Santora Affidavit, ¶ 50). Plaintiff expanded his original proposal for "Father's Day" to two pages, and submitted the expanded proposal to Kane on November 1, 1980. In the expanded proposal, Murray suggested that Bill Cosby play the part of the father, and that Diahann Carroll play the part of Cosby's wife. He also made several other casting suggestions and included other details for the show. Following the submission of this expanded proposal, Murray made an oral presentation to Kane setting forth some ideas that he had for the characters and for story lines. (Complaint, ¶¶ 16, 17).

On November 21, 1980, NBC, through Kane, returned the proposal to Murray, and informed him that "we are not interested in pursuing [its] development at this time." (Exhibit C to Complaint). Plaintiff's other proposals also were rejected by NBC. Plaintiff claims that NBC retained copies of his "Father's Day" submissions. (Complaint, ¶ 26). Kane left NBC before plaintiff commenced this action, and NBC no longer has any references to Murray's proposals in its files. NBC counsel sent a letter to Murray in 1985, stating that a thorough search of the files had been made, and had produced no documents in support of plaintiff's claims.

In the fall of 1984, NBC began broadcasting *The Cosby Show*, starring Bill Cosby. *The Cosby Show* is a half-hour, weekly situation comedy series featuring an upper middle-class black family. The mother is a lawyer, and the father is a physician. Bill Cosby plays the part of the father. Plaintiff believes that *The Cosby Show* is derived directly from his proposal for "Father's Day." Plaintiff asserts that the concept of the show is similar. He points to the similarity of such details as the number of children in the family, the fact that the eldest child is away at college and appears only periodically, and the fact that both parents are working professionals. Most importantly, plaintiff contends that *The Cosby Show*, like his proposal, is the first television series to portray an intact black family in a color-blind, nonstereotypical manner.

*The Cosby Show* has been an outstanding artistic and commercial success. The press has described it as a breakthrough in the industry, noting that television "has had successful comedies based on a variety of Black caricatures—'maids, butlers, and jive-talking youngsters—but the Cosby Show breaks through the stereotypes to portray another view of the Black family: intact, successful, sensible, and funny.'" (Complaint, ¶ 29, quoting *The New York Times*, Nov. 18, 1984).

Plaintiff claims that "solely because he is Black, and because of NBC's refusal to deal with him as a Black American, he has been denied any participation in the show" and that "if a White executive producer had proposed ["Father's Day"] that person would now be enjoying the full fruits of the tremendous success of [*The Cosby Show*]." (Complaint, ¶ 38).

Plaintiff has alleged numerous claims arising from NBC's appropriation of his idea, including claims of race discrimination under 42 U.S.C. §§ 1981 and 1982, a claim of false designation of origin under the Lanham Act, 15 U.S.C. § 1125, claims of

misappropriation and conversion, breach of implied contract, unjust enrichment and fraud. Plaintiff's "Second Cause of Action" arising under 42 U.S.C. § 1985 and his "Fourth Cause of Action" arising under RICO, have been withdrawn.

Plaintiff seeks compensatory and punitive damages, an accounting, a constructive trust for plaintiff's benefit on all profits and gross revenues realized by defendants from *The Cosby Show*, a declaratory judgment that Murray "is the sole owner of all rights in and to the idea, proposal and property of ... Father's Day and all exploitations thereof" (Complaint, ¶ 102(f)), and an injunction stopping the showing of *The Cosby Show* unless Murray receives credit for casting and creating the show. Plaintiff also seeks interest, costs, and attorneys' fees.

In support of their motion for summary judgment, defendants assert that plaintiff has no legally protected right to an idea that is not new. Defendants contend that because plaintiff's proposal lacked novelty, all of plaintiff's claims must be dismissed.

For the reasons discussed below, defendants' motion is granted.

## DISCUSSION

### 1. *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that "a court shall grant a motion for summary judgment if it determines that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The essential question on a motion for summary judgment is whether there is a genuine dispute about a material fact. This standard closely parallels the test for a directed verdict. If the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202

(1986). After adequate time for discovery, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, summary judgment may properly be granted. In such a situation there can be no "genuine issue as to any material fact," since a failure of proof on an essential element of the case of the nonmoving party "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### 2. *The "Novelty" of Plaintiff's Proposal*

■ Both sides agree that New York law governs the central issue of whether plaintiff's idea is property subject to legal protection. Defendant argues that under New York law, the lack of novelty of an idea is fatal to any cause of action based on the use of that idea. *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972). In *Downey*, the court recognized that an idea may be property if it is novel and original. But when an idea is submitted to another, "no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are missing...." 31 N.Y.2d at 61, 334 N.Y.S. 2d at 877, 286 N.E.2d at 259.

In *Ed Graham Productions, Inc. v. National Broadcasting Co., Inc.*, 75 Misc.2d 334, 347 N.Y.S.2d 766 (Sup.Ct.N.Y.Co. 1973), the court summarized the law as follows:

> [W]here plaintiff's idea is wholly lacking in novelty, no cause of action in contract or tort can stand based upon the alleged misappropriation of that idea. Even if it be assumed that defendant had utilized plaintiff's idea, plaintiff may not recover if the idea was unoriginal. (Citations omitted.)

75 Misc.2d at 337, 347 N.Y.S.2d at 769. For purposes of this motion only, I have assumed that defendants used plaintiff's idea. Thus, the sole issue before me is whether the idea contained in plaintiff's "Father's Day" proposal was sufficiently

novel to support a claim for its unlawful use.

In his Statement Pursuant to Local Rule 3(g), plaintiff asserts a number of facts which he contends are undisputed and establish the novelty of his proposal. First, the agreement between Carsey–Werner and NBC for *The Cosby Show* series provides that a failure by Carsey–Werner to perform "shall cause NBC irreparable loss of a unique, intellectual property." (3(g) Statement, ¶ D). Furthermore, at his deposition, defendant Tartikoff described *The Cosby Show* as "add[ing] a new and unique dimension to the American television family program genre." (3(g) Statement, ¶ H). Also, Cosby testified at his deposition "that he would agree with a description of 'The Cosby Show' as unique, novel and a breakthrough in television programming." (3(g) Statement, ¶ I). Reviews of *The Cosby Show* have referred to it as "a breakthrough," a show that "breaks through the stereotypes" and "the first upper-middle class all-black family ever on TV." (3(g) Statement, ¶ J). Finally, plaintiff argues that because his proposal was based on his own life and family, it is necessarily novel. (3(g) Statement, ¶ C).

As discussed briefly above, plaintiff's "Father's Day" proposal contained an idea for a half-hour weekly series centering on a black, middle-class American family. Plaintiff first submitted a cover letter addressed to William Dannhauser and a one-page written proposal describing his idea for the program. Because the details of plaintiff's idea are essential to a decision on its novelty, the substantive portions of the first proposal are set out in their entirety:

> The leading character will be the father, a 45–year–old attorney in private practice who is a devoted family man and a compassionate proud, authority figure. The mother, loving and supportive, is a county administrative worker who finds joy in striking a balance between her family and her work. The family includes four children; a son, 14, a daughter, 7, a second daughter, 4; and an infant son. The family's eldest son, 20, is a scholar of a distant college and is preparing for law school. He makes only periodic appearances, but his life has continuing impact upon his family at home.

> The family lives in a home located in a suburb of a major city. This program adds a new and unique dimension to the American television family program genre. It is not a situation comedy *per se*. While humor may be a factor on occasion, it is not essential to the main focus of the program.

> The characters are real people in real life situations, striving for personal achievement. The program may well resemble "Father Knows Best" and "The Dick Van Dyke Show." It will be radically different from "The Jeffersons," "Good Times," "Different Strokes," and "That's My Mama." The father will not be a buffoon, a supermasculine menial, or a phantom. Children will not engage in eyerolling "sassiness," or abusive anti-social behavior. The mother will be neither a heavy-set cleaning woman, nor a struggling person without purpose or direction. In short, the characters will present various human personalities. The program will show how a Black father can respond with love to something as mundane as a Father's Day card, and will present a closely-knit family and who [sic] how much they care for and support one another (which was the strong quality of "Roots".)

Plaintiff submitted his expanded proposal for "Father's Day" on November 1, 1980. This proposal did not add significant details to plaintiff's original proposal except that it suggested casting for the show. Plaintiff proposed that Bill Cosby should play the role of the father and Diahann Carroll the role of the mother. He suggested actors for several of the supporting roles as well. Plaintiff also wrote that:

> A recurring element of this program will involve situations in which the father's traditional views of success and the roles of fathers, mothers, and children are challenged by a new set of rules and ideas. For example, the father is continuously upset by the rapid decline of the value of the dollar, particularly in light of his many years of struggle to

achieve middle-class status. He is also disgruntled about the decline of educational values and the rise of the drug culture which surrounds his children, in their integrated, middle-class environment. With tongue-in-cheek humor, he re-evaluates middle-class American life, with a Black perspective, and adjusts his perception of the American dream in light of new realities.

To the extent that plaintiff's proposed program "may well resemble 'Father Knows Best' and 'The Dick Van Dyke Show,'" it cannot be considered novel. An idea for a family situation comedy involving a white family would certainly not have been novel in 1980 since all of the networks had already run numerous variations on this theme. Plaintiff's assertion of novelty rests on the fact that the family to be portrayed in his proposed program was black. It is this characteristic which plaintiff emphasizes as the factor that makes his idea novel and legally protectible. Plaintiff stated in his Affidavit in opposition to defendants' motion:

When I created "Father's Day", I had in mind to create a show that was new and unique and would portray a Black family as it had never been shown before on television.... I also had, as a Black man, a strong desire to produce a show with strong and positive role models for the Black community, and to make a statement regarding the love and integrity of the Black family to the world. I think every Black person in this country knows there has been a need for this, and that never before on television had there been a portrayal of a Black family as I created it for "Father's Day."

An essential element of "Father's Day" was the lead role for the male, a person of great strength and character, who was the predominant figure in the family. No one can dispute the need for such a positive role model for Black males prior to "Father's Day."

(Murray Affidavit, ¶¶ 10, 11).

The question presented in this case is therefore a narrow one: whether the proposed use of a black family made "Father's Day" such a novel and original conception that it transformed a common and frequently utilized formula for family situation comedies into an idea entitled to legal protection.

Two factors preclude a finding that plaintiff's idea was sufficiently novel to be entitled to protection. First, plaintiff's proposal merely combined two ideas which had been circulating in the industry for a number of years—namely, the family situation comedy, which was a standard formula, and the casting of black actors in non-stereotypical roles, for which the television industry recognized a need. To a limited extent, the networks had already cast black actors in non-stereotypical roles.

The second factor precluding a finding of novelty in this case is that *The Cosby Show* is closely related to television programs with which Bill Cosby has been associated in the past. In fact, in 1965, Cosby himself publicly expressed his desire to develop a television series depicting a middle-class black family.

### A. *Prior Network Programs*

In opposition to defendants' motion, plaintiff submitted an affidavit of J. Fred MacDonald, a professor of history at Northeastern Illinois University in Chicago. MacDonald's work has focused on "the portrayal and treatment of Afro–Americans (or Black Americans), both in front of and behind the camera, by the television industry." (Affidavit, ¶ 1). In view of plaintiff's heavy reliance on MacDonald as an expert on the history of the television industry, I have carefully examined MacDonald's analysis and the descriptions of prior television programs contained in his book, *Blacks and White TV: Afro–Americans in Television since 1948* (*"Blacks and White TV"*). (Exhibit E to Murray Affidavit).

Professor MacDonald states in his Affidavit that "I consider 'The Cosby Show' a radical break with the racist traditions of past portrayals of Blacks on television." (¶ 8). But MacDonald's own book describes a number of earlier television shows fea-

turing black actors. All of these television programs predated *The Cosby Show*.

MacDonald's book shows that Bill Cosby was the first black actor to star in a prime time television series on a major network. Cosby played Alexander Scott in the dramatic series *I Spy* from 1965 to 1968:

> Casting Cosby as Alexander Scott, the tennis trainer and traveling companion of [Robert] Culp's character, fellow agent Kelly Robinson, broke the color line as had no series in TV history.
>
> . . . .
>
> As well as being the first network drama with an Afro–American star, *I Spy* was a landmark program for blacks in other respects. Alexander Scott was placed solidly beyond the borders of the United States, swept up in the dynamics of world affairs. . . .
>
> Cosby's character . . . was unlike Shaft, Superfly, and other exaggerated "superspade" characters developed in the so-called blaxploitation films of the next decade. Alexander Scott was a real, mature human character—able to feel and express emotions historically forbidden to black characters in mainstream entertainment media.

*Blacks and White TV* at 110–111.

According to MacDonald, the series *Julia*, starring Diahann Carroll, which was broadcast from 1968–1971, centered on a self-supporting professional nurse who lived in a racially integrated apartment building. She was a "war widow" raising a son and "was the most assimilated black character ever to appear in the American mass media." *Blacks and White TV* at 115. As far as the show itself was concerned:

> *Julia* made no pretense of dealing with contemporary social issues. Indeed, it studiously avoided them. A weekly visit with the Bakers involved the same simple problems encountered for decades on such shows as *I Love Lucy*, *Family Affair*, and the *Donna Reed Show*.

*Id.* at 115.

MacDonald points out that the show was criticized for a number of reasons, including its unrealistic depiction of a black wom-an, the fact that the lead character was "female and husbandless" and that the program as a whole seemed patronizing to Blacks. *Id.* at 117. These criticisms notwithstanding, *Julia* was a series which portrayed a black woman facing the everyday, mundane problems dealt with in countless other television series. To that extent, it was very similar to Murray's proposal to portray black characters as "real people in real life situations, striving for personal achievement." (Murray proposal).

MacDonald also discusses *Room 222*, which was broadcast by ABC from 1969–1974. *Room 222* featured Lloyd Haynes, a black actor, as a history teacher at an integrated high school. MacDonald summarized the program as follows:

> The sympathetic characters portrayed by Haynes and [Denise] Nicholas [a black actor who played a school guidance counselor] represented a positive statement about black middle-class success. In charge of young lives, here were responsible black adults making all the right moves. . . .
>
> The professionals in *Room 222* had achieved. They were laboring now so that black youngsters could follow them to the American Dream. . . . Not simply principals in a TV series, these were role models of what 'the good life'—a world of rational thought, attractive people, and financial sufficiency—offered for those who would abandon bitterness and work to overcome within the system.

*Blacks and White TV* at 129.

Another television series discussed by MacDonald, the *Bill Cosby Show*, ran from 1969–1971 and featured Cosby as the lead character, Chet Kincaid, a high school track coach who was "middle-class, professional, and educated." *Id.* at 117. MacDonald described the *Bill Cosby Show*, in part, as follows:

> [T]he series was a statement about black life, an endorsement of the middle-class, educated black man who has not deserted the ghetto but moves gracefully between both worlds. Through his character, Cosby served to defang the contemporary familiar image of riotous blacks.

He also suggested to blacks still in poverty that they were not forgotten by those who had obtained an education and credentials to operate in the wider, primarily white society.

*Id.* at 118.

Another show created by Cosby was *Fat Albert and the Cosby Kids*, an animated Saturday morning program which was first shown on television in the fall of 1972. MacDonald described this program as follows:

> [T]his animated Saturday morning series featured Bill Cosby as host to the adventures of a group of black youngsters growing up in an urban environment. The show was drawn in part from Cosby's memories of his own childhood in Philadelphia....
>
> Working with a panel of social scientists and educators, CBS and Cosby used the program as a vehicle for teaching ethics, social values, judgment, and personal responsibility. Here was a fusion of education and entertainment, precipitated for the most part by Cosby....
>
> As well as presenting black characters in a positive perspective, *Fat Albert* treated issues such as lying, tolerance, coping with death in the family, playing hooky, cheating on tests, and ganging up on a child because he or she is different.

*Id.* at 195.

MacDonald's book also discusses *Barefoot in the Park*, a television series which was first shown in the Fall of 1969, and lasted for only thirteen weeks. Based on Neil Simon's hit Broadway play and movie, the series depicted a young middle-class black couple living in New York City and their struggles during the first years of marriage:

> [T]he comedy in the series was uninspired, and the image of an attractive young couple kissing and joking their way through married life was already an over-used format.

*Id.* at 119. It is difficult to understand why, apart from their relative success, a show featuring a young black middle-class couple, apparently for the first time, would be considered "an over-used format," while a program based on the life of a middle-class black family and resembling the *Dick Van Dyke Show* or *Father Knows Best* should be considered novel.

Although plaintiff is correct that some of the cases on which defendants rely are factually distinguishable because they involved trade and advertising proposals rather than creative works, the legal principles they embody are not limited to trade cases.

In *McGhan v. Ebersol*, 608 F.Supp. 277 (S.D.N.Y.1985), plaintiff sued for violation of a joint venture agreement and misappropriation of ideas in connection with a television series, "Friday Night Videos," a music video show broadcast on NBC on Friday evenings. Defendant moved for summary judgment on the ground, *inter alia*, that the plaintiff's proposals for the program were not sufficiently original to allow the plaintiff to assert a protected interest.

The court reasoned that in order to succeed on his claim of misappropriation, plaintiff would have to establish two essential elements: a legal relationship between the parties and a novel and concrete idea. *Id.* at 284. The court held that although a question of fact existed as to the legal relationship between the parties, the plaintiff had failed to prove that the ideas for which he sought compensation "were both novel and concrete." *Id.* at 285. The court rejected a number of plaintiff's claimed ideas on the ground that

> While it is true that the fact that a plaintiff's idea 'embodies elements long in use does not of itself negate originality or novelty,' *Baut v. Pethick Const. Co.*, 262 F.Supp. 350, 361 (M.D.Pa.1966), in order to be protectable, adaptations of ideas must:
>
> > show genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge ... [t]he judicious use of existing means or the mixture of known ingredients in somewhat different proportions—all the variations on a basic theme—partake more of the nature of elaboration and renovation than of innovation. *Educational Sales Programs, Inc. v.*

*Dreyfus Corp., supra,* [65 Misc.2d 412,] 317 N.Y.S.2d [840] at 844.

*Id.* at 286.

In his proposal for "Father's Day," plaintiff took already existing ingredients from the basic theme of the family situation comedy. If plaintiff's submission in 1980, which was expressly rejected by NBC in November of 1980, were to be considered novel, it would mean that defendants would be barred from televising a family situation comedy starring Bill Cosby, if the family is an intact family unit. *See, e.g., Soule v. Bon Ami,* 201 A.D. 794, 195 N.Y.S. 574 (2d Dep't 1922), *aff'd,* 235 N.Y. 609, 139 N.E. 754 (1923); *see also Educational Sales Programs, Inc. v. Dreyfus Corp.,* 65 Misc.2d 412, 416, 317 N.Y.S.2d 840 (Sup.Ct. N.Y.Co.1970) ("One cannot be forever barred from using a worthwhile but unoriginal idea merely because it was once asked to be treated in confidence.").

### B. *Bill Cosby's Previous Work*

The other major impediment to a finding that plaintiff's idea was sufficiently novel to constitute property is that Cosby himself had previously proposed an idea which was very similar to the core of plaintiff's proposal. In an interview which appeared in the *New York Sunday News* on December 12, 1965, Cosby discussed his ideal television series:

It won't be unlike other situation comedies. There'll be the usual humorous exchanges between husband and wife in the style made famous by Dick Van Dyke and Mary Tyler Moore. Warmth and domestic cheerfulness will pervade the entire program.

Everything on the screen will be familiar to TV viewers. But this series will be radically different. Everyone in it will be a Negro.

. . . .

Bill seeks to initiate the all-Negro series for one specific reason: "I'm interested in proving there's no difference between people. My series would take place in a middle-income Negro neighborhood. People who really don't know Negroes would find on this show that

they're just like everyone else. There would be no Negro jokes on my series, or attempts to sway people to move into segregated neighborhoods. The show would be my personal answer to bigots who regard Negroes as animals and not human beings."

(Exhibit 1 to Jones' Affidavit).

The history of Cosby's television career argues strongly against the novelty of Murray's proposal. In support of their motion for summary judgment, defendants submitted two videotapes: one, the initial episode of *The Cosby Show,* the other, a sampling of Cosby's prior work in television and his recordings. What is apparent from this material is that themes of parenting, parent-child relations, and child behavior have pervaded Cosby's work in all media. In virtually every project in which Cosby has been involved, he has applied the ideas of black family and non-stereotypical black characters.

The fact that plaintiff himself proposed to cast Bill Cosby as the central character in his program is further evidence that Cosby is connected—even in plaintiff's mind—with the concept that plaintiff seeks to monopolize. At plaintiff's deposition, he pointed out how important Cosby was to his proposal because Cosby was "known as a very funny person" and "would bring to the program the kinds of elements that I wanted to project." (Murray deposition at 328). "In addition to Mr. Cosby's popularity, part of what he had been doing for a living was standup comedy in which he was giving anecdotes about his childhood past and childhood experiences and also stories about his own family, his own wife and children." (*Id.* at 328). In discussing the sources for his proposal, Murray stated that:

[T]he basis of this program is my life as a father based on my experiences as a child and husband and father and that these were kinds of things that I wanted to bring to this show. I felt that Mr. Cosby's experiences were things that were public knowledge, so that the success of the show would be a combination of his qualifications based on what the

public knew of him and the things that I had created.

(*Id.* at 331).

When plaintiff's proposal is viewed in light of Cosby's own work and career, and of the progression of programs featuring black actors that went before *The Cosby Show*, plaintiff's idea cannot be considered sufficiently novel to create a property interest.

3. *The Effect on Plaintiff's Claims of Plaintiff's Failure to Establish Novelty*

A. *Plaintiff's Intellectual Property Claims*

Plaintiff's Fifth, Sixth and Seventh "Causes of Action" relate to defendants' allegedly unlawful use of plaintiff's idea. Plaintiff's "Fifth Cause of Action" is for misappropriation and conversion of his idea. In his "Sixth Cause of Action," which is against NBC only, plaintiff claims that NBC "breached its implied agreement with plaintiff and its confidential relationship with plaintiff." (Complaint, ¶ 85). Plaintiff's "Seventh Cause of Action" is for unjust enrichment.

Lack of novelty is fatal to all of these claims. Unless an idea is novel, it does not constitute property, and recovery cannot be obtained for its unlawful use. *See Downey v. General Foods Corp.*, 31 N.Y.2d 56, 61, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972) (If an idea is not novel, "no promise to pay for its use may be implied, and no asserted agreement enforced."); *see also Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 300 (2d Cir.1985) (quoting *Downey* ); *Ed Graham Productions, Inc. v. National Broadcasting Company, Inc.*, 75 Misc.2d 334, 336, 347 N.Y.S.2d 766 (Sup.Ct.N.Y.Co.1973) (lack of novelty in plaintiff's proposal for a cartoon series precluded a finding that it was exclusive property capable of protection).

■ Moreover, with respect to plaintiff's cause of action for breach of an implied contract, "[a] contract cannot be implied *in fact* where the facts are inconsistent with its existence; or against the declaration of the party to be charged.... The assent of the person to be charged is necessary and unless he has conducted himself in such a manner that his assent may fairly be inferred he has not contracted." *Miller v. Schloss*, 218 N.Y. 400, 406, 407, 113 N.E. 337 (1916) (citations omitted). The facts in this case do not support a finding of an intent to contract. On the contrary, the complaint alleges NBC's express rejection of plaintiff's proposal. (Complaint, ¶ 25).

■ In addition, unjust enrichment, or an implied contract in law, "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." 218 N.Y. at 407, 113 N.E. at 339. Defendants cannot have enriched themselves at the expense of the plaintiff since plaintiff had nothing of value to confer. *See, e.g., Educational Sales Programs, Inc. v. Dreyfus*, 65 Misc.2d 412, 415, 317 N.Y.S.2d 840 (Sup.Ct.N.Y.Co.1970).

B. *Plaintiff's Section 1981 Claims*

■ Plaintiff's "First Cause of Action" based on defendants' alleged deprivation of plaintiff's "right to make and enforce contracts" must also fail because plaintiff is unable to establish that his "idea and proposal for 'Father's Day' was novel, original and concrete." (Complaint, ¶ 45). Plaintiff's claim under 42 U.S.C. § 1981 is based on the premise that his idea constituted property for which he could contract. In view of the idea's lack of novelty, plaintiff has no property right to assert, or of which he could have been deprived.

C. *Plaintiff's Lanham Act Claim*

■ Plaintiff's "Third Cause of Action" alleges that defendants failed to designate him as the creator and/or originator and the casting person of *The Cosby Show*. (Complaint, ¶ 63). Lack of novelty is fatal to this claim as well. Because the idea was not novel, it must be considered to have been in the public domain and, therefore, not attributable to any one individual.

### D. *Plaintiff's Fraud Claim*

■ Plaintiff's "Eighth Cause of Action," against NBC only, sounds in fraud. Plaintiff alleges that NBC concealed its interest in "Father's Day" and the development of *The Cosby Show,* and misrepresented its interest in plaintiff's proposal. This claim also cannot survive in view of plaintiff's failure to establish that his idea was novel. Plaintiff alleges that defendant's fraudulent acts "included its conversion of plaintiff's property, breaches of implied contract and its confidential relationship with plaintiff" (Complaint, ¶ 95). These are the same grievances asserted in the Fifth and Sixth causes of action, and cannot succeed for the same reason. Plaintiff cannot be defrauded of property that he does not own.

### CONCLUSION

For the reasons discussed above, plaintiff cannot establish an essential element of all of his claims. Therefore, defendants' motion for summary judgment is granted.

SO ORDERED.