764 So.2d 8 (1999)
John P. ALEVIZOS, Appellant,
v.
The JOHN D. AND CATHERINE T. MacARTHUR FOUNDATION, an Illinois not-for-profit corporation, Abacoa Development Company, a Delaware corporation, and F.O.D., Inc., a Florida corporation, Appellees.
No. 97-3215
District Court of Appeal of Florida, Fourth District.
February 24, 1999.
*9 John F. Mariani, and Alexander D. del Russo of Levy, Kneen, Mariani, Curtin, Wiener, Kornfeld & del Russo, P.A., West Palm Beach, for appellant.
D. Culver Smith, III, and Elizabeth D. Stone of Holland & Knight LLP, West Palm Beach, for appellee The John D. and Catherine T. MacArthur Foundation, an Illinois not-for-profit corporation.
Donald R. Bicknell, Jr. of Gary, Dytrych & Ryan, P.A., North Palm Beach, for appellees Abacoa Development Company, a Delaware corporation, and F.O.D., Inc., a Florida corporation.
GROSS, J.
John Alevizos appeals an order granting appellees' motion to dismiss his complaint for failure to state a cause of action. We hold that the complaint failed to state a claim for misappropriation of an idea and for a contract implied in law and affirm.
To rule on a motion to dismiss, a court's gaze is limited to the four corners of the complaint, including the attachments incorporated in it, and all well pleaded allegations are taken as true. See, e.g., Provence v. Palm Beach Taverns, Inc., 676 So.2d 1022 (Fla. 4th DCA 1996).
According to the complaint, Alevizos is the chairman and the majority shareholder of Alevizos Group, which administers real estate holding and investment companies. Alevizos has also been involved with professional baseball throughout his adult life. From 1969 through 1974, Alevizos served as the administrative vice president for the Boston Red Sox, a major league team. While with the Red Sox, Alevizos was responsible for designing the spring training complex in Winter Haven, Florida, now used by the Cleveland Indians. The project was financed without resort to the City of Winter Haven. Alevizos' financing plan "involved the ground leasing of private lands for commercial developments that made land donations (from their sale) profitable enough to subsidize most of the construction of the complex." An attachment to the complaint described plans for the Winter Haven complex as involving the "development of 60 acres on the perimeter [of the ballpark] that includes two huge motels, two restaurants and a nine-hole par-3 day-night golf course."
The complaint alleges that commencing in 1989-90, Alevizos began to:

*10 develop the concept of constructing in northern Palm Beach County a residential and commercial development centered around a spring training baseball complex, similar in some respects to the development and funding of the baseball complex in Winter Haven, Florida. [Alevizos] reviewed numerous sites, studied zoning and land use plans, and met with municipal and county officials to determine as well as promote the level of community interest in such a project.
Over the next several years, Alevizos conducted studies for the development of a planned unit development which he called Westbrook. The complaint contends that "[t]he unique feature of Westbrook was the use of a spring training baseball complex as the "anchor" of a planned [unit] development involving community, commercial, residential and recreational uses." In addition to his contacts with public and agency officials, Alevizos negotiated with three major league baseball teams concerning their interest in a spring training complex in Jupiter, Florida.
Alevizos identified a potential site for Westbrook 937 acres owned by appellee MacArthur Foundationwhich abutted the Florida Turnpike. Alevizos met with Lee Wheeler, the director of marketing for the MacArthur Foundation. Wheeler told him that the Foundation could not participate in any way in the development of the land. He indicated that the Foundation might be interested in selling the land, but that Alevizos "would have to provide him with significant information and studies on his development plans in order to fulfill [the Foundation's] fiduciary responsibility of insuring that it secured a fair market return for the sale" of the land. Pursuant to this request, Alevizos:
disclosed his Report and its findings to Wheeler and presented him with a copy. This disclosure to Plaintiff was confidential in nature and was not intended for any purpose other than to satisfy the [MacArthur Foundation's] Board that it could secure the fair market return for the sale of the land. The disclosure was a prerequisite set for negotiations to proceed in order to acquire the land.
Although the complaint characterizes Alevizos' report as "extensive," the bulk of it is comprised of newspaper and magazine stories, reports prepared by others, and information generally available from the Palm Beach County Chamber of Commerce. One page summarizes the planned unit development,[1] another page projects revenue from land sales and operating income, and another page is a drawing of a "preliminary conceptual plan" for the development. Along with the report, Alevizos made a written offer to purchase the land.
Alevizos continued negotiating with the MacArthur Foundation. Alevizos met with city representatives "to discuss the concept and to ensure that there would be no municipal objection" to the proposed development. He advised Wheeler that he had received the endorsement of "city, county, and other municipal officials concerning the concept of building a spring training complex in northern Palm Beach County." Ultimately, the MacArthur Foundation indicated that it was unwilling to sell land to Alevizos.
While Alevizos was negotiating with the Foundation, George DeGuardiola was appointed as co-chairperson of a task force created to locate a site for a new baseball stadium in Palm Beach County. According to the complaint, DeGuardiola and the MacArthur Foundation "began discussions *11 on the concept of developing and constructing a planned community built around a Spring Training Complex along the lines proposed by [Alevizos]." The complaint alleges that DeGuardiola and the Foundation established the appellee corporations, F.O.D., Inc., and Abacoa Development Company, and "proceeded to implement and use the essential plans, studies and original ideas" Alevizos had presented to the Foundation.
In June 1993, the Foundation and DeGuardiola publicly announced their tentative plans for the construction of a planned community organized around a baseball stadium in northern Palm Beach County on a 2,000 acre site located less than two miles from the site Alevizos had proposed for Westbrook. In 1995, F.O.D., Inc. submitted an application for development approval of a planned unit development called Abacoa. The town of Jupiter approved the application. In early 1996, F.O.D., Inc. assigned its rights as developer of Abacoa to Abacoa Development Company. The complaint contends that in developing Abacoa, appellees have "used, adopted and implemented [Alevizos'] development plans, concepts, and the Report" without his permission.
Alevizos brought a two count cause of action against appellees, for misappropriation of an idea and for unjust enrichment. The trial court granted the defendants' motion to dismiss the complaint for failure to state a cause of action.
A cause of action for misappropriation of an idea was planted in Florida law by Garrido v. Burger King Corp., 558 So.2d 79 (Fla. 3d DCA 1990). An earlier case, Air Travel Assocs., Inc. v. Eastern Air Lines, Inc., 273 So.2d 3 (Fla. 3d DCA 1973), referenced the cause of action without deciding whether it should apply in Florida. Garrido adopted a body of law developed in New York and in the federal courts. Under these authorities, the essential elements of a cause of action for misappropriation of an idea are: (1) the idea must be novel; (2) the disclosure of the idea must be made in confidence; and (3) the idea must be adopted and made use of by the defendant. See Garrido, 558 So.2d at 83; Official Airlines Schedule Info. Serv., Inc. v. Eastern Air Lines, Inc., 333 F.2d 672, 673-74 (5th Cir.1964).
Application of the elements of the cause of action requires a court to determine when an idea becomes property such that the idea's originator can assert proprietary rights over it. As explained by one commentator:
Due to the nature of an idea, it cannot be possessed if it is known by others.
For example, if X conceives of an idea, which unknown to her is generally known by scientists, can she possess the idea? X may be able to personally use the idea and even sell it to others who are not aware of it. She may even be able to exert dominion and control over her personal knowledge of the idea by keeping it secret and by disclosing it to others only pursuant to a contract requiring that the idea be kept secret. However, she is powerless to prevent the scientists who are aware of the idea from using it. In fact, those scientists are free to disclose the idea to everyone without X having any ability to prevent such actions. Such an analysis seems to establish that X has the right to use the idea. However, her right to possess and alienate it will depend on the degree to which it is known by others. This analysis explains the development of the often judicially stated requirement that ideas must be "novel" before they are considered property. This requirement can really be viewed as a shorthand statement of whether the particular idea at issue is subject to being possessed by someone in accordance with the bundle of rights definition of property. Hence, an idea that is not novel is in the public domain and can be used freely by anyone. Such an idea is not property, and it is therefore not possible to steal it. *12 Andrew Beckerman-Rodau, Are Ideas Within the Traditional Definition of Property?: A Jurisprudential Analysis, 47 Ark. L.Rev. 603, 617-18 (1994) (footnotes omitted).
Many misappropriation cases focus on the novelty and originality of an idea, "since the property right in an idea is based upon these two elements." Downey v. General Foods Corp., 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257, 259 (1972); see Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1178-79 (2d Cir.1993); Murray v. National Broad. Co., 671 F.Supp. 236 (S.D.N.Y.1987), aff'd, 844 F.2d 988 (2d Cir.1988). Ideas which reflect "genuine novelty and invention" are fully protected against unauthorized use. Murray, 844 F.2d at 993 (citing Educational Sales Programs, Inc. v. Dreyfus Corp., 65 Misc.2d 412, 317 N.Y.S.2d 840, 844 (N.Y.Sup.Ct.1970)). Ideas which are not novel "are in the public domain and may freely be used by anyone with impunity." Ed Graham Prods. v. National Broad. Co., 75 Misc.2d 334, 347 N.Y.S.2d 766, 769 (N.Y.Sup.Ct.1973).
"[C]ourts have applied a stringent test in determining whether an idea is a truly innovative one which merits special protection." Paul v. Haley, 183 A.D.2d 44, 588 N.Y.S.2d 897, 903 (1992). An original or novel idea is not a variation on a basic theme or an adaptation of existing knowledge. See Garrido, 558 So.2d at 84; Jones v. Turner Broad. Sys., Inc., 193 Ga.App. 768, 389 S.E.2d 9, 11 (1989). To warrant protection, an idea must
show genuine novelty and invention and not merely a clever or useful adaptation of existing knowledge * * * Improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions-all the variations on a basic theme-partake more of the nature of elaboration and renovation than of innovation.
Paul, 588 N.Y.S.2d at 903 (quoting Educational Sales Programs, 317 N.Y.S.2d at 840).
Case law provides a number of examples of plaintiffs who were unable to meet the burden of showing that their idea was sufficiently novel to make out a misappropriation case. For example, in McGhan v. Ebersol, 608 F.Supp. 277 (S.D.N.Y.1985), the plaintiff claimed that the defendant had misappropriated his idea for "Friday Night Videos," a music video show broadcast over the NBC television network. In granting summary judgment in favor of the defendant network, the court found that the plaintiff was "unable to point to any specific component ... that did not have its origin either in MTV or in the industry in general." Id. at 287; see Marraccini v. Bertelsmann Music Group, Inc., 221 A.D.2d 95, 644 N.Y.S.2d 875 (1996) (concept for music video cable television channel, with the marketing of associated merchandise by means of home shopping not novel and original idea).
Similarly, the plaintiff in Murray claimed that his idea for a situation comedy had been misappropriated by the creators of "The Cosby Show." Both the trial and appellate courts concluded that the plaintiffs idea for a situation comedy, similar to "Father Knows Best" and "The Dick Van Dyke Show," but which focused on a black, middle-class family in non-stereotypical roles, was a mere "adaptation of existing knowledge" and of "known ingredients," thereby lacking "genuine novelty and invention." 844 F.2d at 992 (citation omitted). As the trial court in Murray explained
The question presented in this case is... a narrow one: whether the proposed use of a black family made [the plaintiffs idea for a show] such a novel and original conception that it transformed a common and frequently utilized formula for family situation comedies into an idea entitled to legal protection.
[P]laintiffs proposal merely combined two ideas which had been circulating in *13 the industry for a number of years-namely, the family situation comedy, which was a standard formula, and the casting of black actors in non-stereotypical roles, for which the television industry recognized a need.
Murray, 671 F.Supp. at 241.
Finally, in Downey, the plaintiff claimed that General Foods misappropriated his idea to market its own Jell-O product to children under the name "Wiggley" or a variation of that word including "Mr. Wiggle." The New York Court of Appeals held that the plaintiffs idea, "use of a word (`wiggley' or `wiggle') descriptive of the most obvious characteristic of Jell-O, with the prefix `Mr.' added," was lacking in novelty and originality. 334 N.Y.S.2d at 876, 286 N.E.2d at 259.
We agree with the trial court that Alevizos' idea to use a spring training baseball complex as the "anchor" of a planned unit development is not that type of novel or original idea which entitles it to the special protection afforded by the misappropriation cause of action. A real estate development centered around a baseball stadium had previously been built in Winter Haven. While the Westbrook concept may have envisioned different components than any existing development, with its combination of a golf course, resort hotel, regional outlet mall, and residential community, the idea fails the novelty requirement of the cause of action. Westbrook was a mixture of "known ingredients in somewhat different proportions," an adaptation of existing knowledge, rather than genuine novelty and invention. It is difficult to see how the general idea for a planned unit development could ever satisfy the novelty requirement of the cause of action; the multiple uses of real estate are public knowledge and their combination will always be a variation on a theme.
Finding the novelty element to be lacking, we do not address the other grounds for dismissal outlined by the trial court. Because it was not briefed by the parties, we do not reach the issue of whether we should adopt the Restatement (Third) of Unfair Competition in this area. See Gary Myers, The Restatement's Rejection of the Misappropriation Tort: A Victory for the Public Domain, 47 S.C. L.Rev. 673 (1996).
Alevizos' second count was for a contract implied in law or quasi contract.
The elements of a cause of action for a quasi contract are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.
Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co., 695 So.2d 383, 386 (Fla. 4th DCA 1997) (citations omitted). For the appellees' use of the Westbrook concept, there could be a contract implied in law only if the idea were novel, under the guidelines set forth above. See Surplus Equip., Inc. v. Xerox Corp., 120 A.D.2d 582, 502 N.Y.S.2d 491, 492 (1986); Lehman v. Dow Jones & Co., 783 F.2d 285, 300 (2d Cir.1986). Non-novel ideas do not constitute property for which the law will create an obligation to pay. See Murray, 844 F.2d at 994. Non-novel ideas are in the public domain and may be used by anyone; it is therefore not inequitable to allow a defendant to use such an idea without paying for it.
AFFIRMED.
POLEN and TAYLOR, JJ., concur.
NOTES
[1] The first paragraph of the summary described the proposed development as follows:

On the basis of the "assumptions" indicated in the following Exhibit I, in addition to the 1900 unit Golf-Residence Community, the Jupiter PUD features a 118 acre Business Park, a 200 room Golf-Resort Hotel, a full range of Public Golf facilities including a full course, a night/day Par-3, and a driving range, plus a Manufacturers Outlet Mall topped off with a Major League Baseball Spring Training Complex with its' [sic] 5,000 seat multi-purpose stadium and a 3,000 car parking facility.