Petition of ROSENMAN & COLIN for an Adjudication of its Rights in the Matter of

**Julian SHERRIER, Plaintiff,**

v.

**Bernice RICHARD, Defendant.**

**No. 82 Civ. 3723 (RWS).**

United States District Court, S.D. New York.

July 30, 1987.

Rosenman & Colin, New York City, pro se; J. Kelley Nevling, Jr., Steven M. Dixon, Cynthia First Matte; of counsel.

Brown & Seymour, New York City, for Bernice Richard; Whitney North Seymour, Jr., Craig A. Landy, of counsel.

## OPINION

SWEET, District Judge.

This is part of the bitter detritus of the dispute between the two former lovers, defendant/respondent Bernice Richard ("Mrs. Richard") and plaintiff Julian Sherrier ("Sherrier"). It takes the form of a proceeding by petitioner Rosenman & Colin, a well known law firm, to fix its fees for defending Mrs. Richard in the action between Sherrier and Mrs. Richard which determined their respective rights to Gandharan art that had become part of the currency of their relationship. Based upon the findings of fact and conclusions of law set forth below, the petition of Rosenman & Colin is granted, and judgment will be entered in accordance with this opinion.

**Prior Proceedings**

The controversy between Sherrier and Mrs. Richard was the subject of extensive litigation, culminating in a prior decision, *Sherrier v. Richard,* 564 F.Supp. 448 (S.D. N.Y.1983), in which Rosenman & Colin represented Mrs. Richard. Rosenman & Colin thereafter withdrew as Mrs. Richard's attorneys, and on June 17, 1983 filed a petition seeking an attorneys' lien and the payment of fees and costs. Motions to dismiss certain affirmative defenses to the petition were heard and determined, as well as a number of other motions including a motion to disqualify the court. Discovery was undertaken and was the subject of additional motions.

Mrs. Richard also commenced a malpractice action against Rosenman & Colin in the Supreme Court of the State of New York which was then removed to this court and thereafter remanded at Mrs. Richard's request. The positions of Mrs. Richard varied over the course of this proceeding and have been the subject of prior opinions. She has been successful in preserving the trial of her malpractice case before a jury in the state court.

A hearing was conducted by the court from March 23 to March 31, 1987, and post trial submissions were completed by the parties on June 1. Mrs. Richard did not submit evidence to establish her malpractice claim although, of course, certain of her evidence was relevant on that issue as well as on the validity of Rosenman & Colin's claimed attorneys' lien.

This brief recital of the prior proceedings is sufficient to demonstrate that this litigation has been thorough and hard fought by highly skilled advocates for both sides. Although the subject matter of this proceeding is painful to all concerned, including the court, involving as it does a dispute between a lawyer and client, the difficulty of the issues was lessened by the effective performance of counsel.

**Findings of Fact**

No evidence presented in this proceeding has altered the previous factual findings in the action between Sherrier and Mrs. Richard. To the extent that those findings are relevant here, they are adopted.

Rosenman & Colin is a general partnership engaged in the practice of law with its

principal place of business located at 575 Madison Avenue, New York, New York. During the period at issue and at the present time it is well regarded in the area of litigation. Mrs. Richard lives in New York with substantial indicia of wealth: a townhouse, an art collection and foreign travel.

George N. Richard, Mrs. Richard's late husband, was a client of the Rosenman firm prior to his death in late 1971, and left an estate in the neighborhood of $10 million. His estate and testamentary trusts were handled by Rosenman & Colin thereafter. After the death of Allan Emil, a Rosenman partner, in 1978, Mal L. Barasch ("Barasch"), a partner in the firm since 1968 and presently head of its Trusts and Estates Department, was the partner responsible for the estate and served as co-trustee of trusts with Mrs. Richard.

From 1972 until 1983, Mrs. Richard was a client of the Rosenman firm and consulted Barasch for legal advice in connection with the remodeling of her house; for personal advice regarding her sister and daughter; and for financial advice concerning her husband's estate, as well as for her own account. During this time a relationship of trust was developed. Barasch drafted Mrs. Richard's will, executed on April 15, 1976, and was named as executor and trustee and remained so until August, 1983. When Mrs. Richard was about to undergo surgery in December, 1980, she informed Barasch that she was going to advise the hospital to notify him in the event that anything were to happen to her. When a change of financial advisor was sought for the estate and for her personal account, Barasch accompanied Mrs. Richard to several interviews with investment advisors.

In 1979, Mrs. Richard discussed with Barasch for the first time her romantic involvement with Sherrier following Sherrier's suggestion that Mrs. Richard consult with her lawyer concerning United States divorce laws as they might apply to him. In addition, prior to October, 1980, Mrs. Richard also briefly discussed with Barasch her business dealings with Sherrier, and

Barasch suggested that Mrs. Richard talk to a Rosenman partner, Ralph Colin, about certain art purchases she was contemplating.

By 1980 Mrs. Richard was familiar with lawsuits and the litigation process. Between 1966 and 1980 she had been involved in some twenty lawsuits, including claims by and against a number of contractors and litigation over taxes and a contract relating to Ruby Foo's Den, a small business taken over by Mrs. Richard. She handled some of her own cases successfully in Small Claims Court. In connection with the termination of her husband's estate, Mrs. Richard and Rosenman & Colin resolved the matter of the fees to be charged which amounted to $300,000.

Barasch was the partner at the Rosenman firm responsible for preparing and submitting bills to Mrs. Richard. Barasch's general practice was to call Mrs. Richard before sending her a bill and discuss with her the time charges for services rendered on her behalf and the amount he proposed to bill. Barasch informed Mrs. Richard on several occasions of the hourly rates of the attorneys working on her matters. On a number of occasions Mrs. Richard objected to the quality of the work done, and Barasch discussed proposed bills with Mrs. Richard and agreed to charge her less than Rosenman's actual time charges for certain periods. As a result of this process, Mrs. Richard was aware before October of 1980 that Rosenman billed for its services on an hourly basis, using standard hourly rates assigned to each attorney, and she was generally familiar with what those rates were.

On the afternoon of Saturday, October 4, 1980, Mrs. Richard met with Barasch in his office. At this meeting, which lasted about three hours, Mrs. Richard told Barasch for the first time the whole history of her relationship with Sherrier, described the sums of money that she had advanced to him, asserted her claims to an interest in various works of sculpture, told him of her suspicions that Sherrier had misled her about the cost of those works, and disclosed that a piece that she owned, the

Padmapani bronze, had been stolen and that some of the $90,000 in insurance proceeds had been paid to Sherrier. She asked Barasch for his advice and assistance in asserting her claim to the proceeds of the claim for the loss of the Padmapani Bronze and her rights in the Fasting Buddha and other works and in determining whether Sherrier had deceived her. She told Barasch that she wanted him to make Sherrier realize that he was not going to get away with his conduct toward her.

On Monday, October 6, 1980, Barasch had further conversations with Mrs. Richard about her dealings with Sherrier with particular regard to the Padmapani Bronze. Barasch told Mrs. Richard that Rosenman would be willing to represent her in her dispute with Sherrier if she would agree to pay Rosenman's normal hourly time charges without any discount. Mrs. Richard asked whether the proposed fee arrangement would result in Rosenman's acquiring an interest in the Fasting Buddha, and Barasch assured her that it would not, and that the fee would simply be the firm's total undiscounted time charges.

On October 7, 1980, Barasch and Mrs. Richard met again in Barasch's office. He asked her to sign a letter agreement which provided, *inter alia,* as follows:

> This is to confirm that you [Mrs. Richard] have agreed to retain us [Rosenman firm], and that we have agreed to represent you in connection with matters arising out of your financial relationships with Julian Sherrier. We will be paid for our services on your behalf at our normal time charges, and will be reimbursed for all out-of-pocket disbursements incurred on your behalf. We will not participate in any settlement you will make with Mr. Sherrier.

> Each of us will have the absolute right to terminate our representation of you at any time.

Mrs. Richard read the letter and again inquired whether it permitted the Rosenman firm to acquire an interest in the Fasting Buddha. Barasch told her that it did not. Mrs. Richard then signed the retainer letter.

This was the first time that she had signed such a letter with respect to any litigation or dispute in which Rosenman represented her. At the time of signing this letter ("the Retainer") no immediate litigation was anticipated, and no new matter memorandum was prepared by Barasch.

After some preliminary discussions with Barasch, Sherrier retained Norman Senior, Esq. ("Senior") to represent him in his dispute with Mrs. Richard. Barasch spoke with Senior by telephone on November 12, 1980, met with him on November 17, and spoke with him numerous times thereafter in the period from November, 1980 through February, 1981 about possible ways of settling the dispute between Sherrier and Mrs. Richard. Barasch and others at Rosenman negotiated an escrow agreement under which Mrs. Richard received $74,700 of the $90,000 in insurance proceeds for the Padmapani Bronze.

At Mrs. Richard's request, Barasch and Gerald H. Rosenberg ("Rosenberg"), met with Robert Ross ("Ross"), an attorney, and Dara Zargar, an acquaintance, in order to obtain further information about Mrs. Richard's financial and personal relationships with Sherrier. Rosenberg is and has been a partner in the Rosenman firm since 1978. Between 1971 and 1975, he was an Assistant United States Attorney for the Southern District of New York, serving as Chief of Civil Appeals during part of that time, and he had considerable civil and criminal trial experience.

Barasch and Rosenberg made arrangements for Ross to meet with a British solicitor to discuss the possibility advanced by Mrs. Richard of a suit by her against Sherrier in London. In the period between November, 1980 and the first part of 1981, Barasch consulted with Rosenberg about whether Mrs. Richard should sue Sherrier and then advised her not to bring suit under the circumstances, including the fact that she had received the bulk of the insurance proceeds of the Padmapani Bronze and had physical possession of the sculptures in question. Barasch also told her at

this time that it was inadvisable for her to sue because of the expense.

Statements for legal services were sent by Rosenman to Mrs. Richard during the period between October 1, 1980 and the end of 1981. The first of these statements was accompanied by a letter of November 19, 1980 stating: "I am going to bill you monthly so that you will know at all times exactly how much this matter is costing you." Those statements reflect the following charges for services rendered and disbursements incurred:

| Date of Cover Letter | Period Covered | Sherrier Fees in Period | Other Fees and Disbursements | Due at End of Period |
|---|---|---|---|---|
| 11/19/80 | Oct.80 | $2,700. | $_____ | $3,700. |
| 12/29/80 | Nov.80 | 4,230. | $_____ | 7,930. |
| 2/11/81 | Dec.80 | 4,750. | 100. | 12,780. |
| 3/16/81 | Jan.81 | 2,415. | 85. | 15,280. |
| 3/30/81 | Feb.81 | 3,329. | 6. | 18,615. |
| 5/29/81 | Mar.–Apr.81 | 80. | 2,082.84 | 20,777.84 |

Although the bills were for monthly periods, they were not submitted monthly or on a fixed schedule.

It was the practice of Rosenman & Colin to charge its clients, including Mrs. Richard, a fee based on the number of hours expended by the firm's attorneys, paralegals and clerks performing services on behalf of the client, multiplied by an hourly rate assigned to each attorney, paralegal and clerk. Prior to February 1, 1983, each attorney, paralegal and clerk would record on time tickets the amount of time he or she spent on each particular matter on a given day and submit the time tickets to the firm's timekeeping department on a regular basis. The time tickets were submitted to an outside service bureau that prepared a monthly computer run setting forth the total number of hours expended on behalf of the client by each attorney, paralegal and clerk and the dollar value of those services based on the individual's hourly rate. The computer runs were returned to the firm's timekeeping department, which reviewed them against the time tickets to confirm their accuracy and made them available to the attorney responsible for billing the client. The billing attorney reviewed the computer run to determine its accuracy and to eliminate or reduce any time charges that seemed excessive in light of the services provided. Based upon his review, the billing attorney prepared a memo to the firm's billing committee recommending either that the client be charged at the firm's customary rates or at a premium or discount thereto. If the proposed bill was approved by the billing committee, it would then be sent to the client by the billing attorney.

On or about March 16, 1981, in response to an inquiry from Mrs. Richard, Barasch sent her a letter which explained how Rosenman & Colin had computed its charges to her for 1979 and the first eight months of 1980. This letter identified each of the partners, associates and paralegals who had worked on her matters, described the work done and number of hours spent by each of them and stated that, at the firm's "normal hourly rates," the 15¼ hours of work performed "would have amounted to $1,973." The billed amount was reduced. During 1981 and the first part of 1982, Mrs. Richard made payments to Rosenman against her obligations but never asked for further information about how Rosenman's charges to her for the period following October 7, 1980 were calculated, or complained about those charges.

On June 7, 1982, Sherrier filed suit against Mrs. Richard in this court and simultaneously moved for a preliminary injunction seeking possession of the sculptures, as well as a temporary restraining order. That afternoon, while Mrs. Richard was in his office to discuss other matters, Barasch told her about the lawsuit and Sherrier's application for a temporary restraining order. He explained to her that the litigation was going to be expensive. He told her in response to her question concerning alternatives that she could retain a smaller law firm which might charge lower rates, but that another large firm would charge comparable rates to Rosenman & Colin. She said she wanted Rosenman & Colin to represent her. Barasch indicated to Mrs. Richard that Rosenberg would be the litigation partner in charge of the litigation, and Rosenberg joined them for a brief meeting.

On June 8, 1982, Rosenberg appeared at a conference before the court where Sherrier's request for a temporary restraining order was denied, a hearing on his preliminary injunction motion was scheduled for July 6, 1982, and expedited discovery was granted. Senior asked the court to consolidate the preliminary injunction hearing with the trial on the merits, but Rosenberg objected, based, in part, on the pendency of a demand for a jury trial, and the court did not order consolidation. After this conference, Senior spoke to Rosenberg and stated, among other things, that it made no sense to litigate the case and that Sherrier was prepared to consider any reasonable settlement proposal Mrs. Richard might want to make.

After returning from court on June 8, Rosenberg met with Barasch. Together they telephoned Mrs. Richard and told her what had transpired, including Senior's settlement overture. Rosenberg told Mrs. Richard that it was his best estimate that her legal fees in the lawsuit would be in the range of $7,000–$10,000 per week, up to the hearing on the preliminary injunction, thus amounting to a sum in the neighborhood of $50,000.

Mrs. Richard testified that she understood Rosenberg's statement in the conversation to be that the litigation would cost her $50,000, a recollection which is either selective or in error even if held in good faith.

On June 29 at a pretrial conference an agreement to preserve the status quo was reached, the discovery period was extended, and a trial date of September 20, 1982 was set. On September 17 motions addressed to discovery were heard and disposed of, and on September 27 a trial date of October 12 was fixed. At a pretrial conference on October 7, Rosenberg's application to adjourn the trial date was denied, and the trial commenced on October 13 and was concluded on October 27.

Post trial submissions were made on December 10, and a decision was rendered on March 16, 1983. Motions were addressed to the form of the judgment to be entered, a supplemental opinion was filed on May 6, 1983, and a final judgment was entered on May 9, 1983. On May 18, Rosenman & Colin moved to withdraw as counsel for Mrs. Richard.

In the course of defending the action against Mrs. Richard, Rosenman & Colin performed extensive services.

Rosenberg worked with Lauren Reiter Brody, Esq. ("Brody"), an associate in the Litigation Department of the Rosenman firm since 1979, who received her J.D. degree from Columbia University in 1979. Prior to June of 1982 she had had experience in examining witnesses at trial and in pretrial depositions. Brody, who also had a background in art, worked on the Sherrier lawsuit on a continuing basis from early June through mid-December, 1982. Both lawyers devoted an average of about 20–25 hours per week to the case during that period, except that their hours were substantially higher during the first few weeks of the litigation, when they were preparing for the preliminary injunction, and in October, when the case was tried.

Douglas N. Gordon, Esq. ("Gordon"), a litigation associate and a 1974 graduate from Columbia Law School, was actively involved in the Sherrier lawsuit through

August 6, 1982. At that point his involvement became much less. He billed 4.5 hours to the case during the rest of August and 46.5 hours during September. Beginning in October, Gordon increased his involvement in the case for the duration of the trial and the preparation of post-trial papers.

Apart from Rosenberg, Gordon and Brody, only three other attorneys performed substantial work on the Sherrier lawsuit between June 7 and December 31, 1982.

Barasch billed a total of 30.5 hours to the case during these seven months. He conferred with Mrs. Richard and Rosenberg about the case, reviewed memos, and prepared to testify and did testify as a witness in the case.

Douglas Clubok, a Rosenman & Colin associate, on June 10 and 11 did legal research to establish that a preliminary injunction hearing could not be consolidated with a trial on the merits in a jury case. Between June 19 and June 22 he researched arguments that Sherrier had no right to a preliminary injunction.

Susan Arinaga, a Rosenman & Colin associate, began working on the case at the end of September, 1982. She performed legal research in preparation for the trial and in conjunction with the drafting of the post-trial memorandum of law, and she prepared various memoranda reflecting her research, including two memoranda on issues of Pakistani law and its effect on the case. She also participated in the efforts to locate a handwriting expert, helped interview Robert Ellsworth as a potential witness and prepared a memo of that interview, and performed other tasks relating to trial preparation and the post-trial papers. Her time familiarizing herself with the case and attending one day of the trial was written off.

Three law students working for Rosenman & Colin during the summer of 1982 performed legal research on questions pertinent to the Sherrier litigation: Linda Owens researched whether Sherrier or Mrs. Richard had violated the Foreign Corrupt Practices Act and the effect of any such violation, Lisa Mourning researched wheth-er the oral agreements claimed by Sherrier were subject to a statute of frauds defense, and Shelley Rice briefly researched the ethical obligations of museum curators. Rosenman & Colin wrote off part of Ms. Mourning's time and all of the time charges of two other summer associates, Barbara Fischbein and Roberta Schuhalter, who merely attended depositions in the case.

The deposition and trial testimony in *Sherrier v. Richard* was digested for Rosenman & Colin by paralegals employed by the Rosenman firm to assist its lawyers at lower billing rates than lawyers. Seven paralegals digested the depositions in the case, but Rosenman & Colin completely wrote off the time charges of three of the paralegals and substantially reduced the charges for three others. The digests were used to assist the preparation for trial.

In addition, various personnel in Rosenman's managing attorney's office served and filed subpoenas, pleadings and other papers in the action.

Rosenman sent statements to Mrs. Richard on the following dates and in the following amounts for its legal services in representing her in the Sherrier lawsuit:

| Date Statement Was Sent | Period Covered | Charges for Legal Services in Period |
|---|---|---|
| Aug. 5, 1982 | June 1982 | $ 47,670.00 |
| Aug. 30, 1982 | July 1982 | 43,000.00 |
| Nov. 22, 1982 | August–Sept. 1982 | 62,730.00 |
| Dec. 13, 1982 | Oct. 1982 | 90,300.00 |
| Feb. 9, 1983 | Nov.–Dec. 1982 | 64,688.00 |
| | | $308,388.00 |

Rosenman's statement to Mrs. Richard for June, 1982 was accompanied by a cover letter dated August 5, 1982 which stated that "our litigators have been working at the same pace through the month of July, and I am afraid that the amount for that month will be equally high, if not higher."

In connection with the preparation of these statements for legal services in the Sherrier lawsuit, Rosenberg, as the partner in charge of the case, and Barasch, as the billing partner for Mrs. Richard's account, reviewed the computer runs which re-

flected hours worked and total time charged since the prior statement in order to determine what reductions, if any, should be made in the time charges consistent with Rosenman's normal practice. Rosenberg and Barasch agreed on certain reductions in order to eliminate charges or make adjustments for such matters as mere attendance at a deposition. These proposed reductions were approved by Rosenman's billing committee. All of the amounts that Mrs. Richard were billed by Rosenman for legal services in the Sherrier lawsuit were either at or below Rosenman's normal time charges, and none of them included any premium over normal time charges.

Between June and December 1982 the standard hourly rates of the Rosenman attorneys working on the *Sherrier v. Richard* action were as follows:

| | |
|---|---|
| Mal Barasch | $185/hr |
| Gerald Rosenberg | $150/hr |
| Douglas Gordon | $133/hr |
| Lauren Reiter Brody | $ 98/hr |
| Douglas Clubok | $ 96/hr |
| Susan Arinaga | $ 70/hr |

The 1982 hourly rates of the paralegals and other personnel who billed time to the Sherrier lawsuit were rates consistent with the standard hourly rates being charged by other firms of similar size and stature in New York City in 1982.

Mrs. Richard received Rosenman's statements for legal services in the Sherrier lawsuit shortly after the dates of the covering letters. During the period from May 5, 1982 to May 10, 1983, Mrs. Richard made the following payments to Rosenman & Colin:

| Date | Amount |
|---|---|
| May 21, 1982 | $ 380.00 |
| July 19, 1982 | 1,000.00 |
| July 20, 1982 | 190.00 |
| September 7, 1982 | 25,000.00 |
| September 22, 1982 | 665.00 |
| November 2, 1982 | 25,000.00 |
| November 24, 1982 | 427.50 |
| March 25, 1983 | 570.00 |
| | $53,232.50 |

Certain of these payments, including the two payments of $25,000 each, were made after Mrs. Richard had received statements from the firm. She did not advise the firm orally or in writing at the time she made any of these payments that any one or more of them was intended in full satisfaction of her liability to Rosenman & Colin or that the rendered statements for legal services were excessive.

In conformity with its usual practice of applying payments received on a matter to the oldest outstanding statement first, Rosenman & Colin applied the payments referred to above as follows: first to satisfy Mrs. Richard's indebtedness of $14,463.84 to Rosenman as of May 20, 1982 for services rendered through January 31, 1982, then to satisfy her indebtedness of $280.00 for services rendered between February 1 and May 31, and then to satisfy $38,488.66 of the $47,670.00 in legal fees plus $323.25 in disbursements that she owed Rosenman for services during June in the Sherrier lawsuit.

Mrs. Richard complained to Barasch about Brody's examination of Lerner at his deposition, and also complained to Rosenberg about the summary of facts and evidence prepared by Brody. She also complained to Barasch in 1982 concerning Gordon's supposed lack of "fire" and subtlety, and complained to Rosenberg about Gordon's handling of Heller's deposition, citing statements allegedly made to her by Heller.

Barasch discussed Mrs. Richard's complaints regarding Gordon and Brody with Rosenberg, and they agreed that her complaints were unfounded and that it would not be in Mrs. Richard's best interest to remove either from the case or curtail either of their roles, given their extensive knowledge of the case and the good quality of their work. Barasch so advised Mrs. Richard.

Mrs. Richard complained about the amount of the February 9, 1983 bill covering November and December, 1982 in an immediate and forthright fashion. No agreement was reached on the subject and

Rosenman & Colin submitted no further bills for the services thereafter rendered.

According to Mrs. Richard she understood as a result of her initial conversation with Rosenberg that the defense of the action would cost her $50,000, a notion which had to have been dispelled by the billing for July which arrived on August 30, 1982 which revealed total charges through that period of over $90,000 with the trial yet to come. She made no complaint concerning the amount of the charges. However, throughout the period from June through October Mrs. Richard did raise questions about the work of Brody and Gordon. These objections dealt not with the charges or the time spent but rather with the quality of the work performed.

Mrs. Richard was, quite naturally, intensely involved in the litigation and the manner in which it was conducted on her behalf. Rosenberg and Barasch understood from her statements and the issues that she raised that she sought complete vindication of her position without any significant consideration of the financial implications of the outcome in terms of the value of the sculptures at issue. She directed Rosenberg not to enter any discussions concerning settlement and directed him to consider the initiation of proceedings against Sherrier for smuggling, even though such a course might be harmful to her own property interests. There was nothing in her statements or conduct in the period prior to trial to indicate an intention to proceed at less than full bore to achieve her objective to defeat Sherrier's claim and to cause him as much difficulty and embarrassment as possible.

The accuracy of the Rosenman & Colin records has not been attacked in the main, other than a question concerning certain disbursements, later corrected, and certain errors in the computer runs of $1,088.00.

Expert testimony was presented by Rosenman & Colin with respect to the quality of the services it performed and by Mrs. Richard with respect to the availability of litigation counsel to defend the claim against Mrs. Richard for $50,000. Because of the scope of discovery and the complexity of the relationship between the parties, defense of the action against Mrs. Richard for a fixed fee of $50,000 would have been performed at substantially below the market rate, even for a sole practitioner. However, there is no basis on which to challenge Mrs. Richard's expert that he would have performed the required services for $50,000 and that he knew of other lawyers that would also do so.

Other than the terms under which Rosenman & Colin's services were provided, the principal factual contention advanced by Mrs. Richard is that the efforts made on her behalf by Rosenman & Colin constituted "big firm, big cost litigation." (Respondent's Post Trial Brief, p. 18) and that much of these efforts were unnecessary because the principal issues turned on the credibility of witnesses. In particular, Mrs. Richard cites the following excessive work and unreasonable charges:

(a) Excessive staffing, in turn generating time-consuming staff conferences and coordination.

(b) Wasteful digesting of depositions by non-lawyers, resulting in double effort....

(c) Preparation of a voluminous chronology, when a lawyer's notes on a yellow pad would have sufficed.

(d) Research and writing memos of law on esoteric subjects of little consequence in the litigation. For example, Rosenman charged Mrs. Richard $20,000 for seven (7) memos of law prepared by Susan Arinaga, a first year associate who started work in September, 1982.... One 21-page memo was on the choice of law rules when Sherrier never questioned the applicability of New York law. The cost to Mrs. Richard for *this* memo was $8,400, at a rate of $400 per page.

(e) Attendance by supernumeraries at depositions and court proceedings whose time was billed to Mrs. Richard. For example, Susan Laidhold, a Rosenman paralegal, observed trial on October 21, 1982 and billed her time which was charged to Mrs. Richard; Lisa Mourning, a summer associate was present at Sher-

rier depositions and her time was billed in full.

(Respondent's Post-Trial Brief, pp. 24–25).

Rosenman & Colin has established that Barasch, Rosenberg, Gordon and Brody performed necessary services in connection with Mrs. Richard's defense, and the preponderance of the evidence established that conferences between them were an appropriate subject of billing. The same is true for conferences between them and those doing appropriate research.

Although digesting of depositions is a customary practice for litigation involving many lawyers over a long period of time, no showing of necessity for such digesting has been made here by Rosenman & Colin. The lawyers conducting the depositions were available at the trial, the time between the trial and the taking of the depositions was relatively short, and the depositions, other than Sherrier's, relatively uncomplicated. However, digests of the depositions of two protagonists, Mrs. Richard and Sherrier, were necessary, both for use at other depositions by those not present and for trial purposes.

The chronology of events certainly cost Mrs. Richard money, but at the same time the relationship between the parties was, among other things, fact rich and covered a number of events of differing character over a considerable period. Further, the facts, both corroborating and contradicting Mrs. Richard's position, emerged over the course of discovery. Yellow pads get lost and frayed and are difficult to follow, read and duplicate. In the circumstances of this action, a chronology was a valuable tool, not only for counsel but for counsel's use in marshalling facts with their client.

Research on the statute of frauds, joint venture, the requirements of U.S. Customs regulations, the National Stolen Property Act, and evidentiary issues during discovery was appropriate. Other issues, such as the choice of law and the ethics of testimony by curators were not of sufficient significance to require full blown legal memoranda. The presence at depositions of those other than the attorneys

responsible for conducting the deposition provided no benefit to Mrs. Richard.

No significant attack has been launched on the cost of out-of-pocket disbursements charged which are appropriately documented for appropriate expenses.

Except as noted, the services performed by Rosenman & Colin and its billing practices met or exceeded the standards of the New York legal community. The rates charged were within the range of rates charged by comparable firms, and the time charged was in the main appropriate to the task performed.

**Conclusions of Law**

For the reasons set forth in prior opinions, this court has jurisdiction to hear and fix the amount of any attorneys' lien.

In the period between 1966 and 1980, Rosenman & Colin represented and advised Mrs. Richard in various legal matters. Thus, at the time the Retainer was entered into on October 7, 1980, a relationship of trust existed between Rosenman & Colin and Mrs. Richard, and Rosenman had a fiduciary duty to Mrs. Richard not to breach that trust.

The mere fact that a contract for an attorney's compensation was made during the existence of an ongoing attorney-client relationship, however, does not render the contract *per se* invalid. The cases cited by Mrs. Richard do not hold to that effect. Instead, New York authority holds that an agreement for compensation entered into during the attorney-client relationship is valid if the attorney sustains his burden of proving that the arrangement was fair and reasonable and fully comprehended by the client. *See, e.g., Estate of Schanzer,* 7 A.D.2d 275, 182 N.Y.S.2d 475, 479 (1st Dep't 1959) (citing cases), *aff'd,* 8 N.Y.2d 972, 204 N.Y.S.2d 349, 169 N.E.2d 11 (1960); *Baye v. Grindlinger,* 78 A.D.2d 690, 432 N.Y.S.2d 624, 625 (2d Dep't 1980) (citing cases); *see also Feiber v. Copeland,* 232 A.D. 504, 250 N.Y.S. 429 (1st Dep't 1931).

Rosenman & Colin has sustained its burden of demonstrating that the arrangement was fair and reasonable and fully under-

stood by Mrs. Richard. First of all, the evidence is conclusive that Mrs. Richard fully understood the Retainer when she signed it. The Retainer did not depart significantly from the parties' prior fee arrangements, which had also been based on Rosenman & Colin's normal time charges, even though Rosenman & Colin had granted Mrs. Richard specific discounts from time charges on various occasions. Mrs. Richards was familiar with lawsuits and the litigation process, as well as the billing process and the general hourly rates for attorneys. She had rejected and renegotiated Barasch's proposals on legal fees on numerous occasions before 1972; as she testified, such negotiations had become "a general thing" between them.

Rosenman & Colin met its obligation at the outset of the Sherrier litigation to describe to Mrs. Richard possible alternatives to its representation. Barasch explained to Mrs. Richard that she would be expected to pay Rosenman & Colin's normal time charges without discounts. Barasch also told her that this matter could be very expensive, which she could understand, having been billed as much as $280,000 by Rosenman & Colin for one substantial matter in the past. When Mrs. Richard asked a question about the meaning of certain language regarding Rosenman & Colin's participation in the settlement, Barasch answered her questions fully. Mrs. Richard entered into the Retainer Agreement freely and voluntarily and understood what she was doing.

Rosenman & Colin has also sustained its burden of showing that the fee arrangement was fair and reasonable. Even after Barasch explained to Mrs. Richard that a smaller firm would be able to take her case at a smaller fee, Mrs. Richard chose to remain with the big firm. Compared to firms of the same reputation, quality, and experience, Rosenman & Colin's fees are not unfair or unreasonable.

Thus, the Retainer of October 7, 1980 was a binding agreement between the parties at the time it was written and executed. It was appropriately amplified by Barasch's letter of November 19, 1980 undertaking to bill Mrs. Richard monthly, which must be understood as an undertaking to provide Mrs. Richard with a statement of services in the month following the performance of those services.

Until the commencement of the action by Sherrier on June 7, 1982 this monthly billing practice was followed generally but not consistently. Because of the relatively small amounts of the monthly billings, however, the delay in their delivery did not constitute a breach of the agreement between the parties.

■ A pattern had emerged from 1980 to 1982 of complaints by the client resulting in an occasional reduction of the bills. Following the initiation of the litigation, Mrs. Richard continued to object to the performance of certain services. Those objections, although levelled not at the billing itself, were sufficient in view of the practices adopted by the parties to bar a claim of account stated. Her objection shortly after receipt of the statement mailed on February 9, 1983, which contained a statement of the outstanding balance, was also sufficient to defeat a claim of account stated.

■ As set forth above, through early November Mrs. Richard made substantial payments on the bills previously rendered, the trial having been completed on October 27, 1982. Then on November 22, Rosenman & Colin forwarded their statement for August and September which totalled $62,730 and on December 13, 1982 forwarded their statement for October in the amount of $90,300. These delays constituted a material breach of the undertaking to provide monthly billing.

Although Mrs. Richard had consistently rejected consideration of settlement, had she known the amount of the August and September bills, the financial consequences of the lawsuit might have dampened her ardor in seeking the total defeat of Sherrier's claims. Although in the totality of the circumstances it is doubtful that her course would have changed, she was entitled to "monthly billings" rendered in a fashion prompt enough to permit her to make an informed decision. Presumably because of the pressure of events, that assumed obli-

gation was not met, and the Retainer thereby breached.

■ Since Rosenman & Colin materially breached the Retainer, they are entitled only to a *quantum meruit* measure of recovery against Mrs. Richard. On a *quantum meruit* claim, the court must consider "the time spent, the character and nature of the services rendered, the complexity, difficulty and novelty of the case and the issues confronting the attorney, the attorney's standing in the bar and his professional reputation and experience, the skill exercised in handling the case, the possible consequences of the action and the result obtained." *Newman v. Silver*, 553 F.Supp. 485, 496 (S.D.N.Y.1982), *aff'd in part and vacated in part*, 713 F.2d 14 (2d Cir.1983). It is also appropriate for the court to consider the guidelines for determining the reasonableness of a fee set out in DR–2–106(B):

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Applying these standards to the present case, this court concludes that Rosenman & Colin is entitled to its time charges as the fair and reasonable value of the services rendered, except as noted above. These services were appropriate to the defense Mrs. Richard wished to have conducted, and the charges were commensurate with services and the standards of the attorneys in similar law firms.

The out-of-pocket expenses, the disbursements, were appropriate charges in acceptable amounts. The billing rates and time expended for the services performed were consistent with the practices of other similarly situated law firms. Rosenman & Colin estimated the weekly expenses of the litigation in its early stages and Mrs. Richard was close enough to the day to day endeavors of her lawyers to recognize that the work level had not changed to a marked degree in the months of August, September, and October prior to trial. Mrs. Richard was appropriately advised of the risks of the litigation including its cost.

Rosenman & Colin satisfied its professional obligations and is therefore entitled to the reasonable value of their services as set forth above. Judgment will be entered upon notice within ten (10) days.

IT IS SO ORDERED.